## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DORIS CAMPBELL; TIMOTHY CAMPBELL; DARRELL CHILDRESS; DENNIE COOKE; JOE HIGHFIELD; RUSSELL LEE; WAYNE MOORE; BRAD DAVIS; AL HERNANDEZ; PAT NUGENT; AND RANDY SPILLMAN, | ) ) ) ) ) ) ) | No._____ |
| Plaintiffs, | ) ) | The Honorable _____ |
| v. | ) ) | |
| CHARLES A. WHOBREY; GEORGE J. WESTLEY; MARVIN KROPP; ARTHUR H. BUNTE, JR.; GARY F. CALDWELL; RONALD DESTEFANO; GREG R. MAY; THOMAS NYHAN; and CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

### NATURE OF ACTION

1.      Plaintiffs bring this lawsuit to obtain redress for breaches of fiduciary duty that, if left unchecked, will devastate their retirement security.

2.      Plaintiffs are participants in the Central States, Southeast and Southwest Areas Pension Plan (the "Plan"), a multiemployer defined benefit pension plan as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"), with participants from a variety of industries.

3.      The Plan is massively underfunded.  It is in critical and declining status under 29 U.S.C. § 1085.  It is projected to be insolvent by the year 2026 or before if it continues paying benefits at current levels, assuming investment returns that outpace its historical performance.

4.     Because of this projected insolvency, the Plan's Board of Trustees filed an application with the U.S. Department of the Treasury on September 25, 2015, seeking approval of a plan to reduce benefits under the Multiemployer Pension Reform Act of 2014 (MPRA) (the "Benefits Reduction Plan"). The Benefits Reduction Plan proposes cutting many Plan participants' benefits by up to 60% or more from the amount they earned and were promised pursuant to the terms of the Plan in effect prior to the Benefits Reduction Plan. The Benefits Reduction Plan would drive many existing retirees and their families, including retirees in their seventies with no prospects for future employment, into poverty.

5.     Based on its investment results since the Benefits Reduction Plan was filed, the Plan is likely to become insolvent even with the cuts proposed in the Benefits Reduction Plan.

6.     The Plan's dire condition is a source of grave concern for many. First and foremost, the Plan's participants are already suffering reductions in their earned pension benefits, and face an imminent threat of draconian reductions in the future, followed eventually by the Plan's complete collapse. Local unions that represent those participants are concerned about their members' retirement security, and in particular, the erosion of their pension benefits as the Plan declines. Employers of participants find themselves making massive contributions for benefits their employees will never see. And the government, including the United States Pension Benefit Guaranty Corporation ("PBGC"), risks being left with the aftermath of the Plan's eventual collapse — assuming the Plan's collapse does not take the PBGC down with it.

7.     Plaintiffs are part of a group of Plan participants, all of whom work for The Kroger Co. ("Kroger") or are retired from Kroger and were covered by the agreement negotiated on behalf of current employees (the "Kroger Participants"). The International Brotherhood of Teamsters ("IBT") represents the Kroger Participants in bargaining. The IBT, on behalf of its

Kroger Participants, negotiated a proposal to remove Kroger Participants from the Plan, and create a new plan to provide the Kroger Participants with stable, fully funded pensions (the "Proposal").

8.      The Proposal does not come at the expense of the other participants in the Plan. Under the Proposal, Kroger and the IBT would not only create a new, stable defined-benefit pension plan for the Kroger Participants, but would also remove liabilities from the Plan and result in Kroger's paying a withdrawal liability that exceeds its current obligations to the Plan. Thus, in addition to fully protecting the Kroger Participants, the Proposal would improve the Plan's financial status, and leave every participant in the Plan in the same or a better position than they would be in without the Proposal.  Kroger has even agreed to pay more in connection with the Proposal, if necessary to accomplish its goal of a more secure retirement for the Kroger Participants.

9.      In addition, employees of Kroger's third party logistics providers (companies that provide services to Kroger) who are currently participating in the Plan, will be given the opportunity to negotiate through their collective bargaining representatives to join the new IBT/Kroger plan.

10.      The Plan's Trustees have flatly refused to consider the Proposal to preserve the benefits of the Kroger Participants without harming other Plan participants.  The Plan's Executive Director, Thomas Nyhan, has written that the "the [Plan] has a firm policy against facilitating employer withdrawals in any way," without any apparent consideration of whether those withdrawals could be structured to be neutral toward, or even benefit, the Plan.

11.      The Trustees rejected the Proposal in less than five days.  The fact that the Trustees took so little time to reject a complex Proposal clearly demonstrates that the Trustees

did not consider the Proposal on its merits and did not meaningfully investigate whether the Proposal would benefit the Plan's participants.

12.     In rejecting the Proposal as not in the Plan's interests in less than five days, Defendants did not bother to even attempt to negotiate a deal that would provide greater benefits to the Plan than those offered in the Proposal.  This is true notwithstanding Kroger's offer to absorb increased withdrawal liability to ensure that all participants are in the same or a better position than they would otherwise be because of the Proposal.

13.     The Trustees' refusal to consider the Proposal or even attempt to negotiate favorable modifications to the Proposal harms the Plan's participants and violates ERISA.

14.     In this lawsuit, Plaintiffs seek an order that will require independent consideration and negotiation of the Proposal.  Plaintiffs ask that the Court appoint an independent fiduciary to review the Proposal and determine whether it is in the best interest of Plan participants and, to the extent the independent fiduciary determines that the Proposal, as currently structured, is not in the best interests of Plan participants, to negotiate with Kroger for an arrangement that is in the best interests of Plan participants.  In addition, Plaintiffs request an accounting; a declaration that the Trustees have violated their fiduciary duties under ERISA; other injunctive relief; restitution and damages; and attorneys' fees.

15.     Plaintiffs' request is urgent.  If the Plan does not take further action on the Proposal by the deadline (currently expected to be June 15, 2016), then Kroger and the IBT will have no obligation to go through with the Proposal, and the Kroger Participants will be trapped in a Plan that is about to cut their benefits dramatically and still faces likely insolvency.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

17.     This Court has personal jurisdiction over Defendants pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), which provides that this action may be brought in the district where the Plan is administered, and process may be served in any other district where a defendant resides or may be found. All Defendants reside in or may be found in the United States.

18.     Venue is proper in this district pursuant to ERISA § 501(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and the Plan maintains its primary place of business in this district.

**FACTUAL BACKGROUND**

*Plaintiffs*

19.     Plaintiffs are Kroger Participants who are retired, or are planning for retirement, and are facing dramatic cuts in their retirement benefits under the Benefit Reduction Plan.

20.     Plaintiffs are injured by belonging to a disordered and chaotic Plan. All Plaintiffs are facing worry, stress, and uncertainty about their futures and their retirements. Plaintiffs worry that the Benefits Reduction Plan may push them into poverty or other precarious financial situations that force a dramatic change in their standards of living.

21.     As a group of United States Senators recognized in a letter to the Treasury Department about the Benefits Reduction Plan, participants in the Plan "contributed to their pensions over the course of many years — making the sacrifices of giving up better pay or

improved benefits, or even staying in a physically exhausting job that took them away from their families" so that they could earn the pension they now may lose under the Benefits Reduction Plan. (Ex. 7.) The Senators recognized that there is "no doubt that retirees will face a significant burden as a result of" the Benefits Reduction Plan. *Id.*

22. Plaintiffs who are not yet retired are experiencing lost opportunities to retire, and are being forced to delay their retirements. Those who are already retired may be forced back into the workforce.

23. Plaintiff Dennie Cooke has worked at Kroger since 1973, and participates in the Plan. Mr. Cooke lives in Fishers, Indiana. Mr. Cooke performs factory work, making a variety of dairy products and completing other factory tasks. His forty-three years of factory work have taken a toll on Mr. Cooke's knees, which have both been replaced through surgery. Mr. Cooke wants to retire to avoid putting further stress on his body, but he cannot do so because of the significant pending benefits cuts he expects to take effect under the Benefits Reduction Plan. If the Trustees do not approve the Proposal, he will be forced to continue abusing his knees with factory work; the Proposal would allow him to retire and feel secure.

24. Plaintiff Timothy Campbell worked for Kroger from 1994 until his retirement in 2015, and participates in the Plan. Mr. Campbell lives in Redford, Michigan. Mr. Campbell performed maintenance on factory equipment, such as bottle fillers and dairy process equipment, and made plastic bottles using blow molds. Mr. Campbell is already retired and may not recover his lost pension income if he is not allowed to leave the Plan under the Proposal and the Benefits Reduction Plan goes into effect.

25. Plaintiff Doris Campbell is married to Plaintiff Timothy Campbell. She has worked for Kroger since 1982 and also participates in the Plan. Mrs. Campbell lives in Redford,

Michigan.  She had hoped to join her husband in retirement in 2017, but she is facing severe

reductions under the Benefit Reduction Plan.  The reduction Mrs. Campbell will face under the

Benefit Reduction Plan is compounded because Mr. Campbell's pension is also being cut.

Because her husband is already retired, his options for making up lost income are limited, and

Mrs. Campbell will be forced to continue to work to help make up the losses in both her and her

husband's pensions.  If the Proposal is not approved, Mrs. Campbell does not know if she will

ever be able to retire.

      26.     Plaintiff Pat Nugent worked for Kroger and participated in the Plan for forty years

before he retired in 2015.  Mr. Nugent lives in Martinsville, Indiana.  Mr. Nugent performed a

variety of jobs at Kroger from stacking boxes, to filling containers of ice cream, to flavoring ice

cream, to helping with general plant and warehouse needs.   Mr. Nugent may not be able to

recover his lost pension income if he is not transferred to the new Kroger plan and the Benefits

Reduction Plan goes into effect.  While he had hoped to retire and stay retired, he now expects

that he will have to find part time work to make up for the income he will lose under the Benefits

Reduction Plan.

      27.     Plaintiff Joe Highfield has worked at Kroger and participated in the Plan for his

entire career, beginning in 1984.  Mr. Highfield lives in Westland, Michigan.  Mr. Highfield

worked as a filler for half-gallon cartons of milk; made cottage cheese and yogurt; and worked in

Shipping and Receiving.  The Proposal is crucial to protecting Mr. Highfield and his family.  If

the Proposal goes into effect, Mr. Highfield's accrued benefit will remain unchanged and he will

be able to retire years earlier than if he is forced to remain in the Plan.  Mr. Highfield's pension

allows him to support his wife and five children, including one child who has cerebral palsy and

will never be able to live independently. If the Proposal is not approved and the Benefits

Reduction Plan goes into effect, Mr. Highfield does not know if he will ever be able to retire.

28. Plaintiff Wayne Moore has worked at Kroger and participated in the Plan since

1984. Mr. Moore lives in Howell, Michigan. He stayed at Kroger for so long partly because of

the pension he expected. Mr. Moore and his wife bought a home in the country, expecting to

retire young and have years to enjoy their retirement. Now, Mr. Moore and his wife have

realized that their retirement is not secure and that they cannot rely on receiving any pension

from the Plan. They have turned their attention to earning more money to support themselves

because they expect to lose Mr. Moore's pension. After spending some time as a homemaker,

Mr. Moore's wife has gone back to work, also in an attempt to mitigate the risk of lost retirement

income. Their retirement plans have been put on hold indefinitely.

29. Plaintiff Darrell Childress has worked at Kroger and participated in the Plan since

1984. Mr. Childress lives in Indianapolis, Indiana. Mr. Childress has performed a variety of

warehouse jobs, such as Safety Coordinator, Forklift Operator, Sanitation, and Machine

Operator. He initially planned to retire under the now-eliminated 30-and-out program.

Retirement has become less and less achievable for Mr. Childress as the Plan's condition has

declined and the Plan has eliminated benefits. If Mr. Childress could count on receiving his full

accrued benefit, he would retire within the next year. Because of the Benefits Reduction Plan

and the Plan's general precarious situation, Mr. Childress must delay his retirement and keep

working. Mr. Childress wants to retire and enjoy life while he is healthy, but he now fears that

he will be forced to keep working, letting years that should have been part of his retirement slip

by.

30.     Plaintiff Brad Davis has worked at Kroger and participated in the Plan since 1992. Mr. Davis lives in Hutchinson, Kansas. Mr. Davis is a Warehouseman who runs a forklift and ships and receives groceries. Mr. Davis planned to retire in 2024 at age 60, but if the Trustees do not approve the Proposal, he will likely be forced to keep working until he cannot work any longer because he is worried that his pension will not be secure.

31.     Plaintiff Randy Spillman has worked at Kroger and participated in the Plan since 1979. Mr. Spillman lives in Hutchinson, Kansas. Mr. Spillman has spent essentially his entire career at Kroger, except for a period of military service, and is the Crew Chief in the Maintenance Department at a grocery warehouse. Mr. Spillman planned to retire within the next two years, but if he is not allowed to leave the Plan for the new Kroger plan and the Benefits Reduction Plan goes into effect, he will need to work for years longer.

32.     Plaintiff Al Hernandez worked for Kroger in various warehouse jobs from 1973 until 2009. Mr. Hernandez lives in Hutchinson, Kansas. He is currently retired and receives a pension from the Plan. If the Benefits Reduction Plan goes into effect, it will cut Mr. Hernandez's monthly benefit and have a dramatic impact on Mr. Hernandez's standard of living. Mr. Hernandez has been retired for seven years. He fears that if his pension is cut, he will be forced to find work in retirement, and that he will have limited earning power now that he has been out of the workforce.

33.     Plaintiff Russell Lee has worked at Kroger since 1989 in a variety of jobs at the Crossroads Farm Dairy. Mr. Lee lives in Camby, Indiana. Under the Proposal, he would be able to retire about a decade earlier than if he stays in the Plan, and would be more confident that he will receive full, stable benefits through his retirement.

34. Under the Benefits Reduction Plan, each Kroger Participant in the Plan faces dramatic cuts to his or her retirement benefits. The Plan provides examples of potential cuts under the Benefits Reduction Plan in its application to the U.S. Department of the Treasury. Cuts to Kroger Participants fall within the Plan's Tier 2 cuts. These cuts are drastic. The Plan's examples of Tier 2 cuts range from a 31% to a 71% reduction in accrued benefits.

35. Thus, based on the Plan's examples of Tier 2 cuts, an active, retiree, or beneficiary participant who has less than twenty years of Contributory Service and has earned an accrued benefit of $2,138.31 per month would see a cut to $1,467.52, not accounting for additional cuts based on early retirement or other factors. A Tier 2 active, retiree, or beneficiary participant who has less than twenty years of Contributory Service and has earned an accrued benefit of $1,480.05 per month would see a cut to $1,015.76. A Tier 2 active, retiree, or beneficiary participant who has twenty or more years of Contributory Service and has earned an accrued benefit of $850.35 per month would see a cut to $425.18 per month. A Tier 2 terminated vested participant who has less than 20 years of Contributory Service and has earned an accrued benefit of $475.42 per month would see a cut to $118.86 per month. A Tier 2 terminated vested participant who has twenty or more years of Contributory Service and has earned an accrued benefit of $241.80 per month would see that benefit cut to $120.90 per month.

36. Many of the named Plaintiffs have already received letters notifying them of the benefit cuts they would face under the Benefits Reduction Plan, which are consistent with the severe proposed cuts described by the Plan in its application.

37. For example, Plaintiff Timothy Campbell currently receives a Plan pension benefit of $1,789.67 but he has received notice that his benefits will be cut to $1,371.30 under the Benefits Reduction Plan. The Plan told him that if the Plan becomes insolvent, his PBGC-

guaranteed pension will be $728.41, and that if the PBGC becomes insolvent, his benefit will be "essentially zero." Similarly, Plaintiff Doris Campbell is currently eligible for a monthly pension benefit of $2,634.16 if she retires on May 28, 2025, but she has received notice that her benefits will be cut to $1,706.48 under the Benefits Reduction Plan. The Plan told her that if the Plan becomes insolvent, her PBGC-guaranteed pension will be $1,119.87, and that if the PBGC becomes insolvent, her benefit will be "essentially zero."

38.     Plaintiff Pat Nugent currently receives a pension benefit from the plan of $2,798.54 per month, but he has received notice that under the Benefits Reduction Plan, his benefit will be reduced to $1,558.25 per month. He has received notice from the Plan that his PBGC-guaranteed pension is $1,416.59 and that "if the PBGC runs out of money, as is now projected, your benefit would be essentially zero."

39.     Plaintiff Wayne Moore is currently eligible for a monthly pension benefit of $2,527.49 if he retires on March 19, 2026, but he has received notice that his benefits will be cut to $1,687.66 under the Benefits Reduction Plan. The Plan told him that if the Plan becomes insolvent, his PBGC-guaranteed pension will be $1,084.12, and that if the PBGC becomes insolvent, his benefit will be "essentially zero."

40.     Plaintiff Brad Davis is eligible for a monthly benefit of $1,696.12 per month if he retires on August 18, 2029. He has received notice that under the Benefits Reduction Plan, his benefit will be reduced to $1,284.08. The Plan told Mr. Davis that if the Plan becomes insolvent, his PBGC-guaranteed benefit will be only $793.65 per month, and that if the PBGC becomes insolvent, his benefit would be "essentially zero."

41.     Plaintiff Randy Spillman is currently eligible for a monthly pension benefit of $2,933.44 per month, assuming a July 13, 2021 retirement date, but he has received notice from

the Plan that under the Benefits Reduction Plan, his benefit will be reduced to $1,633.08 per month. The Plan told Mr. Spillman that if the Plan becomes insolvent, his PBGC-guaranteed benefit will be only $1,255.72 per month, and that if the PBGC becomes insolvent, his benefit would be "essentially zero."

42. Plaintiff Russell Lee is currently eligible for a monthly pension benefit of $1,469.14 if he retires on March 21, 2029, but he has received notice that his benefits will be cut to $1,087.00 under the Benefits Reduction Plan. The Plan told him that if the Plan becomes insolvent, his PBGC-guaranteed pension will be $893.75, and that if the PBGC becomes insolvent, his benefit will be "essentially zero."

43. Plaintiffs bring claims both on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and in their individual capacities pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

*Defendants*

44. Defendants Charles A. Whobrey; George J. Westley; Marvin Kropp; Arthur H. Bunte, Jr.; Gary F. Caldwell; Ronald DeStefano; and Greg R. May are Trustees and named fiduciaries of the Plan and made the decisions at issue here. They are referred to collectively as the "Trustees."

45. Defendant Thomas Nyhan is the Executive Director of the Plan. Director Nyhan is included as a defendant because, as Executive Director of the Plan, he is necessary to effectuate the equitable relief requested in this complaint.

46. The Plan is a defendant to the extent that its participation is necessary to effectuate the equitable relief requested in this complaint.

47. The Trustees, the Plan, and Nyhan are collectively referred to as "Defendants."

*The Plan*

48.     The Plan was created in 1955 to provide pension benefits to members of the IBT in the trucking industry, and eventually was expanded to include numerous employers in numerous industries.

49.     Currently, the Plan is one of the nation's largest multiemployer Taft-Hartley defined benefit pension plans, commonly called multiemployer plans.  As of 2013, it had 407,713 participants working in or retired from a variety of industries across the country.

50.     Multiemployer plans are plans maintained by a labor union and more than one employer pursuant to collective bargaining agreements, usually within the same or related industries.  In contrast to a pension plan funded and maintained by a single employer, a multiemployer plan is funded by contributions from multiple employers whose employees then receive their pension benefits from the pooled assets of the multiemployer plan.

51.     A number of contracts affect multiemployer pension plans.  Typically, employers agree to participate in the plans through a collective bargaining agreement with an employees' union.  The amount of the employer's contribution is usually set by a collective bargaining agreement that specifies a contribution formula and schedule, while the benefits available to participants are defined in the plan's governing documents.

52.     Kroger is a national grocery store chain and one of the employers that participates in the Plan.  Specifically, certain Kroger employees are represented by the IBT and participate in the Plan pursuant to a master collective bargaining agreement.   Kroger has participated in the Plan since at least 1970.

53.     According to public comments by the Plan, approximately 5,000 former and active Kroger employees participate in the Plan, and contributions made on behalf of active Kroger employees are approximately 2.5% of the Plan's total contribution revenue.

54.     In addition, the former and active employees of a number of third-party logistics providers that provide services to Kroger participate in the Plan.

*Plan Administration*

55.     The Plan is administered pursuant to a Trust Agreement, which was entered into as of March 16, 1955, and has been periodically amended (the "Trust Agreement"), and a pension plan document, entitled "Central States, Southeast and Southwest Areas Pension Plan," effective January 1, 1985, which also has been periodically amended (the "Pension Plan Document").

56.     The Trust Agreement and Pension Plan Document designate an eight-member Board of Trustees to administer the Plan.

57.     The Trustees are named and functional fiduciaries of the Plan, with direct authority over the administration of the Plan and control over Plan assets.  The Trust Agreement states that the Trustees have the power and authority to control and manage the operation and administration of the Plan in accordance with applicable law.  The Trustees must hold, manage, care for, and protect the Plan's assets.

58.     Similarly, the Pension Plan Document states "the Board of Trustees has authority to control and manage jointly the operation and administration of the Pension Fund and of this Pension Plan in accordance with the terms of the Trust Agreement and of this Pension Plan and amendments thereof, including the authority to establish and effectuate funding policies and methods consistent with the objectives of this Pension Plan, and including the authority provided

by the Trust Agreement to allocate responsibilities for the operation and administration of the Pension Fund and of this Pension Plan." The Trustees also have certain delineated obligations relating to collective bargaining agreements. Among other things, when provided with a collective bargaining agreement ("CBA") between an employer and its employees, the Trustees must engage in evaluation of its merits and either accept or reject the CBA on those merits.

59.     Considering the Proposal is a fiduciary function. In deciding whether to accept or reject the Proposal, or to attempt to negotiate an even better deal for participants, the Trustees are exercising discretionary authority over the management of the Plan and Plan assets, which is a core fiduciary function under ERISA. Accordingly, the Trustees are subject to ERISA's fiduciary duties in making that decision. On information and belief, the Trustees also used Plan assets in reaching and communicating their decision.

60.     Pursuant to the terms of the Trust Agreement, Director Nyhan is responsible to the Trustees for coordinating the administration of Plan assets, office and personnel, for the coordination and administration of accounting and actuarial services, for the preparation of all reports and other documents required to be filed or issued in accordance with law, for the performance of ministerial duties in conformance therewith, and for such other duties duly assigned to him by action of the Trustees. Upon information and belief, Director Nyhan participated in the decisions at issue here and, in consultation with or at the direction of the Trustees, prepared and sent correspondence to Kroger and IBT rejecting the Proposal.

61.     Pursuant to consent decrees between the Plan and the United States Department of Labor in *Frank E. Fitzsimmons, et al.*, No. 78 C 342 (N.D. Ill.); *Perez v. Robbins, et al.*, No. 78 C 4075 (N.D. Ill.); and *Perez v. Dorman, et al.*, No. 82 C 7951 (N.D. Ill.), an Independent Special Counsel has access to the Plan's files and meetings, and supervises the Plan's

15

compliance with the consent decrees. The Independent Special Counsel makes quarterly reports to the court (currently to Judge Shadur) pursuant to those decrees. *See, e.g. Chao v. Estate of Fitzsimmons*, 349 F. Supp. 2d 1082, 1083 (N.D. Ill. 2004), *opinion clarified*, No. 78 C 342, 2004 WL 3094821 (N.D. Ill. Dec. 9, 2004).

*The Plan's Decline*

62.     The Plan has declined precipitously over the last three decades. According to the Plan's public comments, in 1980, 11,657 employers participated in the Fund. As of 2015, only about 1,500 employers remained.

63.     Many factors have contributed to the Plan's decline. The Plan's Application for Benefit Suspension filed with the U.S. Department of the Treasury states that the Plan's decline began with the passage of the Motor Carrier Act in 1980. The ensuing deregulation of the trucking industry caused many employers who had participated in the Plan to fail. In 1999, the trucking industry further declined due to a price collapse in the used truck market, skyrocketing fuel prices, and an ongoing driver shortage. In addition, the Plan was adversely affected by the financial market collapses in 2000 and 2008.

64.     This overall decline has eroded the benefits available under the Plan. Effective January 1, 2004, the Trustees amended the Plan to provide that the contribution-based benefit accrued by a participant would be reduced going forward from two percent of the employer's contributions on a participant's behalf to one percent of those contributions. In addition, the Trustees froze early retirement and "years of service and-out" pensions and froze the various "Classes" of Contributory Service Pensions. Despite these changes, the Plan remained underfunded.

65.     The Plan's deterioration continued after the 2004 amendments, most precipitously when the Plan suffered investment losses of $7.6 billion in 2008 alone due to the financial crisis.

66.     After the Pension Protection Act of 2006 (the "PPA") took effect in 2008, the Plan's actuary certified the Plan to be in critical status, a designation for plans that are either (1) less than 65 percent funded, and whose plan assets plus contributions for the current plan year and each of the six succeeding plan years are less than the benefits and expenses projected to be payable during that period; or (2) expected to experience a funding deficiency in the current year or in the next three years.

67.     In 2009, as a result of the stock market declines and global economic crisis, the Plan was not only certified to be in critical status under PPA, but was also projected to become insolvent.  The Plan's actuaries projected that the Plan would become insolvent in 2022.

68.     By any measure, the Plan is severely underfunded.

69.     Central States lost one third of its assets between 2007, when it had $27 billion, and 2014, when it had assets of $17.8 billion with a liability for promised benefits of $35 billion. It is currently paying out approximately $3.46 in pension benefits for every dollar it receives through contributions.

70.     Most recently, the Plan was projected to become insolvent by 2026 or before if it continues paying benefits at current levels.

71.     Defendants say that the Plan needs an $11 billion government bailout to avoid the cuts in the Benefit Reduction Plan.

*The Proposal*

72.     Recognizing that remaining in the troubled Plan is not in the best interests of the Kroger Participants, Kroger and the IBT began negotiating alternatives that would provide more secure pensions for the Kroger Participants without harming the remaining Plan participants.

73.     As a result of these negotiations, Kroger and the IBT signed a memorandum of understanding on March 20, 2015.  (Exhibit 1.)

74.     Pursuant to the memorandum of understanding, Kroger and the IBT agreed to create a new defined benefit pension plan, and to transfer all liabilities for paying benefits to the Kroger Participants to this new plan.  Unless Kroger and the IBT agree to extend the deadline, the new plan will be formed **only if** the Plan accepts the Proposal, pursuant to the Memorandum of Understanding between Kroger and the IBT, **on or before the deadline negotiated by Kroger and the IBT.**  The initial deadline in the memorandum of understanding is May 1, 2016, but Kroger and the IBT are in discussions about extending the deadline to June 15, 2016.

75.     The Proposal contemplates a spin-off of retiree and active liabilities of Kroger, consistent with ERISA § 4211(e), from Central States to a new IBT/Kroger multiemployer plan. Kroger has committed to significant up-front funding of this new plan, and full funding within three years.

76.     Under the Proposal:

a.     All responsibility for paying the Kroger Participants' benefits would be transferred to the new, Kroger-funded plan;

b.     Central States would retain all of the assets that have been contributed by Kroger in order to fund those benefits; and

     c.   Central States would receive more than Kroger is statutorily required to pay in withdrawal liability — Kroger proposed two additional years' worth of withdrawal liability, and has indicated it would be willing to negotiate an even larger payment.

77.    The Proposal would fully satisfy Kroger's liabilities under ERISA. The Proposal does not require any transfer of Central States' assets to Kroger, and assures Central States that it will receive at a minimum the equivalent of twenty-two years of withdrawal liability payments (two additional years of payments beyond what is required by ERISA). Kroger has further offered to discuss any modifications that Defendants believe may be necessary to ensure that the Proposal results in an improved cash position for the Plan.

78.    The Proposal would provide the Kroger Participants with a fully-funded retirement plan, resulting in nearly complete benefit security without the cuts proposed in the Benefits Reduction Plan or the likely risk of insolvency the Plan faces.

79.    The Proposal also would improve the Plan's financial position. If the Plan agrees to the withdrawal and transfer of liabilities, liabilities will be removed from the Plan without any corresponding diminishment in Plan assets. The funded position of the Plan will immediately improve because liabilities will decrease. In addition, the Plan will be relieved of its obligation to pay benefits to Kroger Participants, eliminating a significant cash liability of the Plan. Participants believe it likely that the Plan's benefit payment obligations to Kroger Participants exceed the statutory withdrawal liability payments that Kroger would make if Kroger left the Plan without the Trustees' cooperation, but the Trustees have not provided to the IBT or Kroger the data necessary to confirm that that is the case, despite requests that the Trustees do so.

80.     Kroger's offer to provide at least the equivalent of twenty-two years' worth of withdrawal liability payments would provide the equivalent of 10% more than the Plan will get if, as the Plan expects, Kroger simply withdraws without transferring its participants to a new plan.

81.     However, the most important benefit the Proposal offers the Plan is that the Plan will immediately cease to have an obligation to pay benefits to Kroger retirees.  Among the largest hurdles to the Plan's stabilizing its financial position is its negative cash flow.  This negative cash flow results from the fact that, on an ongoing basis, the Plan pays out more to fulfill its benefits payment obligations than it takes in from its only two sources of funds — employer contributions and investment earnings.  This would be true even with the proposed benefit reductions.  Each dollar spent paying benefits in the short term hastens the Plan's ultimate insolvency because it not only reduces the Plan's current assets, but also diminishes the Plan's ability to earn investment income on a going forward basis.  Using the Plan's assumption of a 7.5% annual investment return, for example, keeping $1 in the Plan today would mean that, five years from now, the Plan would be better off by $1.44.  Using the same assumptions, paying out $1 less in benefit payment obligations today is the equivalent of receiving $4.25 twenty years from now.

82.     In contrast, if the Proposal is rejected and Kroger withdraws from the Plan, Kroger will make level withdrawal liability payments for twenty years pursuant to ERISA, 29 U.S.C. § 1339(c), while the Plan continues to deplete its pool of investible dollars paying benefits to the Kroger Participants.

83.     Thus, the Proposal is specifically designed to put the Plan in a better position than it would be in if Kroger simply withdrew from the Plan without a spin-off of benefit payment

liabilities to a new IBT/Kroger plan. At a minimum, the Plan would receive the value of two additional years' worth of withdrawal liability payments. But the Proposal has the potential to be worth significantly more. First, Kroger has indicated that it is prepared to consider paying even more than twenty-two years' worth of withdrawal liability. Second, if, as is possible, the elimination of the Plan's obligation to pay benefits to the Kroger Participants **exceeds** the value of the twenty-two years' worth of withdrawal liability, under the Proposal, all of the excess value would go to the Plan.

84. Kroger has made clear that if the Proposal does not, in fact, put the Plan in a better position than it would be in if Kroger simply withdrew from the Plan without a spin-off of benefit payment liabilities, Kroger is willing to negotiate an alternative proposal that does. But despite Kroger's requests, the Plan has not provided Kroger with the information necessary to determine what, precisely, is needed to put the Plan in a better position than if Kroger simply withdrew from the Plan without a spin-off of benefit payment liabilities.

85. The Proposal cannot go forward without the Trustees' agreement because Kroger proposes satisfying its withdrawal liability to the Plan through an immediate transfer of liabilities. If the Trustees do not provide their consent, the new plan will not be formed.

86. The Plan has acknowledged that a Kroger withdrawal is imminent. Yet despite that, as described below, the Plan, through its fiduciaries, has refused to enter into negotiations with Kroger to obtain concessions that would reduce the impact of Kroger's withdrawal on the Plan's participants and put those participants in the same or a better position than they are now.

*Communications Among Kroger, IBT, and the Trustees*

87.     On April 10, 2015, Kroger and the IBT informed the Plan of their collective

bargaining agreement and asked the Plan to agree to the Proposal.  The letter (attached as

Exhibit 2) explained that the IBT and Kroger's goal:

> is to put the Central States Pension Plan (with the transfer) in a
> better position than it would be if Kroger made withdrawal liability
> payments over a period of 20 years.  To the extent this is not the
> case, Kroger is prepared to discuss modifying the terms of the
> transfer and to provide additional consideration in connection with
> a transfer of the Kroger related benefit liabilities which, taken
> together, would be worth more to the Central States Pension Plan
> than cash withdrawal liability payments.

88.     Four days later, on April 14, 2015, the Trustees voted to reject the Proposal.  On

information and belief, Director Nyhan participated in this decision.

89.     The rationales provided for this immediate rejection included that "the Fund has a

firm policy against facilitating employer withdrawals in any way" and that the Trustees were

concerned about "perceptions or inferences drawn from a withdrawal by Kroger" that might

encourage other employers to leave the Plan.

90.     This summary rejection, along with the rationales offered, demonstrates that

Defendants have prioritized keeping the maximum number of employers in the Plan over

promoting the interests of Participants.  (Exhibit 3.)

91.     In defending its application to reduce benefits through its Benefits Reduction

Plan, the Plan stated "[t]he record confirms that, over the course of many years, the Board [of

Trustees] has considered a broad array of proposals, has retained independent experts, and has

implemented every measure that it determined reasonable" to shore up the Plan's solvency.  (*Id.*)

92.     But it is plain that Defendants took no such steps to consider the Proposal.

93.     In their letter rejecting the Proposal (Exhibit 3), Defendants did not mention any investigation they had undertaken (if any), identify any independent experts they consulted (if any), describe any consideration and weighing of the interests of all Plan participants (if any), or request any additional information so that they could consider the Proposal in more detail.   In fact, there was no indication in Defendants' response that they gave any consideration of whether their "no facilitating withdrawals" policy, when applied to the Proposal, was in the best interest of Plan participants, or whether the "concern" the Trustees expressed that other participating employers might follow Kroger's lead had any basis in reality.  Nor was there time to conduct such an analysis in the four days the Trustees took to reject the Proposal.

94.     In response to Director Nyhan's letter, on May 5, 2015, representatives of both Kroger and the IBT wrote to the Trustees to explain why the flat rejection of the Proposal was not in the interests of Plan participants and did not demonstrate that the Plan's participants best interests had been taken into account.  (Exhibit 4.)  Kroger and the IBT stated that:

> The issue the Pension Fund needs to evaluate is whether the Pension Fund would be better off with cash withdrawal liability payments or under the transfer proposal outlined in the IBT-Kroger Notification Letter.  We believe that the Pension Fund will be better off if it accepts the terms of the transfer that have been negotiated.

Kroger also repeated its offer to negotiate a modified Proposal to ensure that the Proposal would benefit all Plan participants.  Defendants did not reply.

95.     On July 1, 2015, Kroger and the IBT again wrote to Defendants, providing copies of the Memorandum of Understanding between Kroger and the IBT and the Kroger Master Agreement with the IBT.

96.     On July 22, 2015, Defendants responded, via a letter from Director Nyhan, requesting information about Kroger's relationships with its third party logistics providers and the IBT.

97.     Kroger and the Plan subsequently executed a confidentiality agreement, and on September 21, 2015, Kroger sent Defendants 1,093 pages of documents relevant to its planned withdrawal, including its contracts with its third party logistics providers; correspondence with its third party logistics providers related to the Proposal; and various letters and correspondence relating to the Proposal.

98.     Despite having possessed this information for more than six months, the Trustees have not engaged in any discussions with Kroger about possible modifications to the Proposal.

*The Plan's Benefit Suspension Application*

99.     Four days after receiving Kroger's documents, on September 25, 2015, the Plan filed its Benefits Reduction Plan application with the U.S. Department of the Treasury seeking approval for a Benefits Reduction Plan under the MPRA.  The Department of the Treasury must decide whether to approve or reject the Benefits Reduction Plan by May 7, 2016.

100.     Under the Benefits Reduction Plan, many Plan participants' benefits would be cut by up to 60% or more from the amount they were promised as part of the collective bargaining process.  Many existing retirees, including retirees in their seventies, will face dramatic income reductions.

101.     If the Department of the Treasury rejects the Benefits Reduction Plan (or finds that there is a deficiency in the application and the application needs to be resubmitted), Central States will not be in a position to refile due to its recent poor investment returns and the Plan will become insolvent within ten years.

102.    The Benefits Reduction Plan, if approved, will cut the benefits of the Kroger Participants and the other Plan participants. Many Kroger Participants have already received notice of their proposed benefit cuts, which are severe.

103.    Of course, the Defendants have another option that would prevent the Kroger Participants' benefits from being cut at all, and improve the funded position of the Plan: They could consider, negotiate, and approve the Proposal.

104.    In connection with the Benefits Reduction Plan, the Trustees were required under ERISA § 305(e)(9)(C)(ii) to determine and maintain a written record that they have taken all reasonable measures to avoid insolvency of the Plan and will continue to take all reasonable measures to avoid insolvency during the period of benefits suspension.

105.    The Trustees have not, in fact, taken all reasonable measures to avoid insolvency of the Plan because they have failed to consider the Proposal or negotiate more advantageous terms for Kroger to exit the Plan while providing benefits to the Plan that help the Plan to avoid insolvency.

106.    Because the Proposal was not meaningfully considered in the Benefits Reduction Plan, which assumed that Kroger will withdraw by July 1, 2016, but did not even mention Kroger's offer to transfer liabilities out of the Plan, and because the Trustees have not even attempted to pursue the proposed Kroger spin-off or attempted to negotiate a more favorable version by, for example, asking Kroger for a larger withdrawal payment, IBT submitted comments on the Benefits Reduction Plan explaining that the Plan has failed to meet the "all reasonable measures" standard in MPRA to avoid insolvency. The IBT's comments are attached as Exhibit 5.

107.    The Plan responded to IBT's comments, but provided no analysis of the actual impact of the Proposal on the Plan or its solvency.  The Plan's response is attached as Exhibit 6.

108.    A group of United States Senators similarly asked the Treasury Department, on April 15, 2016, to perform "a careful analysis" of whether the Plan has "pursued all other reasonable measures before considering cuts."  (Ex. 7.)

109.    In fact, despite the dire cuts and resulting harm to participants, the Benefits Reduction Plan cannot prevent the Plan's eventual insolvency.

110.    According to the Plan's data, which is as of June 30, 2015 (and does not factor in market performance since that time), even with the proposed cuts, the Plan will become insolvent by 2046.  This projection is predicated on the assumption that the Plan earns 7.5% in investment returns every year.  Of course, such a rate of return is impossible to guarantee.  Additionally, because of the Plan's significantly negative cash flow, periods of poor performance have a disproportionately negative impact on long-term returns.

111.    For example, the IBT has projected, using the June 30, 2015 data, that if the Plan experiences a 10% decline in 2016 and earns a 7.5% return thereafter, it will be insolvent in 2034.

112.    Moreover, using the June 30, 2015 data, the IBT has projected that if over the next 14 years the Plan's investment returns mirror the market's performance over the last 14 years, assuming 60% equities and 40% bonds, the insolvency date moves up to 2030.

113.    In fact, because the Plan's position has further declined since June 30, 2015, the true outlook is even more bleak.  The Plan has a significant cash flow problem in the near term and its assets remain highly exposed to market fluctuations.  For example, the market's performance in the third quarter of 2015 was the worst in four years, with a 6.9% decline in the

S&P 500 index.  Recent data from the Plan's Independent Special Counsel shows that during that quarter, the Plan experienced a composite return of -5.75%.  Then, in January 2016 alone, the S&P 500 lost more than 5% of its value.  Although the stock market's performance has since improved, the Plan's significantly negative cash flow makes it particularly vulnerable to market underperformance.  Because, as discussed above, the Plan must continually pay out benefits faster than it takes in contributions, it "locks in" a meaningful portion of any investment losses it incurs.  This means the Plan is in a much worse position than a typical investor, who can choose to ride out market swings by maintaining investments until market conditions improve.

114.     It is very likely that the Plan will seek to make further drastic cuts beyond those already proposed as part of continuing efforts to stave off insolvency.  Those efforts, however, are unlikely to succeed, and may be legally prohibited to the extent that they will not prevent insolvency.

115.     When the Plan eventually becomes insolvent, the PBGC will become responsible for lending money to the Plan to pay participants' pension benefits.  The multiemployer insurance program of the PBGC does not have adequate funding to absorb the cost of the Plan's collapse, and is also projected to become insolvent.  The PBGC does not have statutory authority to raise revenue from any source other than insurance premiums and, in the event of an insolvency, will have no source for guaranteeing benefits other than incoming insurance premiums.  The United States Government Accountability Office estimates that if the PBGC becomes insolvent because a large fund like the Plan fails, the guaranteed benefits for a retiree who once earned a monthly benefit of $2,000 per month would be reduced to less than $125 per month (less than $1,500 per year).

116.     The Plan's decline has prompted widespread concern and outrage among Plan participants.  The Treasury Department has received over 2,800 public comments on the Plan's Benefits Reduction Plan.

117.     The Trustees' failure to investigate or consider the Proposal demonstrates that they have closed their minds to the Proposal and are ignoring the best interests of the Plan's participants because of their single-minded focus on refusing to cooperate in employer withdrawals.

118.     Defendants have repeatedly demonstrated their bias toward keeping employers in the Plan, no matter what the cost to participants who would be better off not belonging to a doomed Plan.

119.     For example, Defendant Nyhan has repeatedly said that the Plan did not support the departure of UPS from the Plan (even though UPS paid an enormous withdrawal liability to the Plan) and that "the whole point of the Multiemployer Pension Reform Act of 2014 is to stabilize multi-employer pension funds, such as Central States, **so that employers are motivated to remain as part of the plan** and benefits can continue to be paid to participants for many years to come."

120.     Defendant Nyhan has repeatedly expressed concerns that the number of employers in the Fund is shrinking, for example, telling a Senate Committee that "[b]ecause employers are fearful of incurring withdrawal liability, the Fund has not been able to attract new employers."

121.     Defendant Nyhan has also admitted, however, that "[a]t the end of the day, we're not going to avoid insolvency without fewer liabilities or more assets[.]"

122.    The Independent Special Counsel reported the Proposal to Judge Shadur but did not express an opinion on its merits.

*One Trustee Finally Meets With Kroger and the IBT*

123.    On information and belief, it was not until October 23, 2015, more than six months after receiving the first letter about the Proposal, and **after** the Plan had already sent its Benefits Reduction Plan application to the U.S. Department of the Treasury, that Director Nyhan and one trustee finally agreed to meet with Kroger and the IBT to discuss the Proposal.

124.    On information and belief, at the meeting, Kroger requested actuarial information from the Plan on behalf of Kroger relating to the Proposal, including data regarding the valuation of Kroger's withdrawal liability and data regarding the valuation of Kroger's post-benefit suspension liabilities and projected benefit payments.  Kroger offered to provide additional information to the Plan, including details about its agreements with the IBT relating to the Proposal, in exchange for the actuarial information.  The parties have yet to sign an agreement about any information exchange, or to exchange any information.

125.    On information and belief, although they have had nearly a year to make a meaningful investigation of the Proposal and make an informed decision, the Trustees have failed to do so.  The Trustees have never explored what modifications Kroger might make to the Proposal to make the Proposal more beneficial for the Plan, despite Kroger's stated intention of leaving the Plan in a better position than if Kroger made withdrawal liability payments over a period of twenty years and offer to engage in further negotiations.  On information and belief, Nyhan and the trustee present at the October 23, 2015 meeting never attempted to engage Kroger over any possible modifications to the Proposal.

126.     The non-Kroger Plan participants could be meaningfully better off, or at least no worse off, with an arrangement that relieves the Plan of benefits payment liabilities than with letting the Plan's current funds continue to dwindle toward insolvency, even while Plan participants take 60% or higher benefit payment cuts.  The Kroger Participants would undeniably be better off for the opportunity to participate in a fully-funded plan.

127.     Further, by failing to meaningfully consider the Proposal, the Trustees have failed to follow a prudent process for considering the Proposal, such as, for example, the process described in Article III § 1 and Article IV § 20 of the Trust Agreement.

128.     If Kroger Participants are not allowed to transfer as a result of the Trustees' actions — or if the Trustees continue to fail to meaningfully consider this Proposal — Kroger Participants should be paid the lost benefits they would have received had the Trustees not breached their duties.

129.     If Defendants fail to act, the consequences to Plaintiffs and other Plan participants will be severe.  Plaintiffs will be stuck in a Plan with dwindling assets that will likely fail eventually.  The Pension Benefit Guaranty Corporation's insurance program for multiemployer pension plans is similarly projected to be insolvent.  In addition to facing sharp benefit reductions in July, Plaintiffs may be left with almost no pension benefits after the Plan fails.

130.     The Proposal promises to shore up the pensions of hundreds of retirees, some of whom will otherwise become dependent on public support in order to survive.  The public bears many of the costs of the Plan's dismal situation and potential collapse, including a potential PBGC collapse, the potential need for government bailouts, an increased strain on limited resources to provide support to destitute retirees, and reduced job availability for new entrants to the workforce as retirees are forced to work longer.  Indeed, in a recent letter, a group of U.S.

Senators recognized that a Plan collapse would make the PBGC "run out of money much sooner" and may require "Congressional intervention." (Ex. 7.) The Proposal would help to ameliorate many of these potential costs.

*The Trustees' Fiduciary Duties*

131. ERISA fiduciaries must act for the exclusive benefit of beneficiaries, and their duties are "the highest known to the law." *E.g., Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). In carrying out their duties, ERISA fiduciaries have a duty of prudence and a duty of loyalty. They must follow Plan documents, and they must preserve Trust assets.

132. Under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), the Trustees have a duty of prudence in their management of the Plan. The duty of prudence mandates that a fiduciary's actions with respect to a plan must be performed "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

133. Under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), the Trustees have a duty of loyalty in their management of the Plan. A fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . .for the exclusive purpose of" providing benefits to the participants and beneficiaries and defraying administrative costs. 29 U.S.C. § 1104(a)(1)(A). An ERISA fiduciary must treat all plan participants impartially and must balance the interests of all plan participants when making decisions.

134.     The Trustees' refusal to consider whether accepting or further negotiating the Proposal is in the best interest of the Plan's participants is a breach of their fiduciary duties under ERISA for which Plaintiffs seek redress in this lawsuit.

## COUNT I – BREACH OF FIDUCIARY DUTY UNDER ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)

135.     Plaintiffs reallege and incorporate herein the preceding paragraphs.

136.     Plaintiffs are participants in the Plan pursuant to 29 U.S.C. § 1002(7).  Each Plaintiff is either an employee or former employee of Kroger who is or may become eligible to receive benefits from the Plan, or whose beneficiaries may be eligible to receive benefits from the Plan.

137.     Plaintiffs bring this actions in a representative capacity on behalf of the Plan.

138.     Plaintiffs are appropriate representatives of the interests of the Plan and are willing and able to do anything determined by the Court to be necessary to safeguard the interests of other participants in the Plan.

139.     The Trustees are fiduciaries of the Plan.  Pursuant to the Trust Agreement, the Trustees have a duty to "hold, manage, care for, and protect the Trust Fund."

### *Breaches of the Duty of Prudence*

140.     The Trustees are breaching their duty to prudently manage the Plan.

141.     First, the Trustees are breaching their duty of prudence by failing to thoroughly investigate alternatives available to the Plan.  For example, the Trustees adopted a flat policy that they will not facilitate withdrawals from the Plan rather than investigating the merits of individual proposals, have not investigated the Proposal, have not considered the Proposal on its merits, and rejected the Proposal less than five days after receiving it.

142.     Second, the Trustees are breaching their duty of prudence by failing to thoroughly investigate alternatives because they have failed to investigate and negotiate an alternative withdrawal proposal under which Kroger would increase the liability it absorbs in order to ensure that all participants benefit from the withdrawal and transfer.  Although Kroger has made clear that it is willing to consider such a proposal, Defendants have made no attempt to discuss possible modifications to the Proposal with either Kroger or the IBT.  This failure to even attempt to discuss alternative withdrawal proposals is all the more dramatic given that Central States has been aware of the Proposal since at least April 10, 2015.

143.     Third, the Trustees are breaching their duty of prudence by failing to preserve trust assets.  The Proposal has the potential to improve the Plan's cash position.  However, the Trustees have flatly refused to consider the Proposal, instead insisting on a course under which the Plan will become insolvent more quickly than if the Trustees accept the Proposal or negotiate an alternative proposal.

144.     Fourth, the Trustees are breaching their duty of prudence by failing to give due consideration to the interests of all Plan participants in their consideration of the Proposal.  The Proposal is indisputably in the best interests of the Kroger Participants, who will be able to receive full pension benefits from a stable plan.  The Proposal is also indisputably in the best interests of the remaining participants, who will benefit from belonging to a Plan that is better off than the Plan will be if Kroger withdraws without the Proposal.  The Trustees have further failed to consider the dramatic benefit for the Kroger Participants, and the additional benefit for the remaining participants, in their flat refusal to consider or negotiate the Proposal.

145.     Fifth, the Trustees are breaching the duty of prudence because they are not following a reasonable process for accepting or rejecting the Proposal.  The Trust Agreement

33

sets forth the procedure for the Trustees' consideration of collective bargaining agreements. Among other things, when provided with a CBA between an employer and its employees, the Trustees must engage in evaluation of the merits of the CBA and either accept the agreement or reject the CBA. Instead of following this, or some similar process to evaluate whether to accept the Proposal or to reject it and bear the consequences of Kroger's withdrawal, the Trustees did not engage in a meaningful process to evaluate the Proposal.

146.     Plaintiffs and the Plan have suffered, and are in imminent danger of further suffering, cognizable losses as a result of the Trustees' breaches. The Trustees are preventing Plaintiffs from moving to a more stable plan that will pay full pension benefits, and are preventing the Plan from realizing the financial value that Kroger has offered in the Proposal. Plaintiffs' pension benefits have been reduced and face a further dramatic reduction if the Benefits Reduction Plan is approved; they face additional reductions as the Plan continues down the path to insolvency, and the PBGC likely follows it. The Plan is underfunded and projected to become insolvent. If the Trustees permit the Proposal to proceed, or negotiate an alternative withdrawal scenario, pensions will not be reduced for Kroger Participants and the Plan will be better off, or at a minimum, no worse off, benefitting all participants.

*Breaches of the Duty of Loyalty*

147.     In refusing to negotiate with Kroger regarding the Proposal, the Trustees are breaching their duty of loyalty in their management of the Plan.

148.     First, the Trustees are breaching their duty of loyalty by refusing to evaluate the interest of Plan participants. The Trustees' failure to investigate or consider the Proposal demonstrates that they have closed minds regarding employer withdrawals and that their views, at least in this situation, are in conflict with the best interests of the Plan's participants.

149. Second, the Trustees are breaching their duty of loyalty by failing to balance the interests of all Plan participants in rejecting the Proposal. The Proposal is indisputably in the best interests of the Kroger Participants, who will be able to receive full pension benefits from a stable plan. By citing the need for continued employer contributions to support benefit payments to the non-Kroger Participants (without undertaking any analysis of the actual impact the Proposal would have on them), the Trustees are improperly prioritizing the perceived interests of the non-Kroger Participants over those of the Kroger Participants. But the Proposal is, or with further negotiation, could be in the best interests of the remaining participants, who will benefit from belonging to a Plan that is better off, or at a minimum, no worse off. The Trustees have failed to weigh the dramatic benefit for the Kroger Participants against any perceived negative impact on the non-Kroger Participants.

150. Upon information and belief, Director Nyhan's participation is required to fully effectuate the equitable relief sought herein.

## COUNT II – BREACH OF FIDUCIARY DUTY UNDER ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)

151. Plaintiffs reallege and incorporate herein the preceding paragraphs.

152. Plaintiffs are participants in the Plan pursuant to 29 U.S.C. § 1002(7).

153. The Trustees have violated and will continue to violate Title I of ERISA and the terms of the Plan as described above.

154. Plaintiffs and the Plan have suffered and are in imminent danger of suffering further cognizable losses as a result of the Trustees' breaches. The Trustees are preventing the Kroger Participants from moving to a more stable plan that will pay full pension benefits, and are preventing the Plan from realizing the financial value that Kroger has offered in the Proposal. Plaintiffs' pension benefits have been reduced and face a further dramatic reduction if the

Benefits Reduction Plan is approved; they face additional reductions as the Plan continues down the path to insolvency, and the PBGC likely follows it. The Plan is underfunded and projected to become insolvent. If the Trustees permit the Proposal to proceed as offered or after negotiating further concessions from Kroger, pensions will not be reduced for Kroger Participants and the Plan will be better off, benefitting all participants.

155.    To redress this imminent harm, Plaintiffs seek equitable relief under § 502(a)(3) of ERISA, including an accounting requiring Defendants to disclose all information that informed their decision to reject the Proposal and all information about the financial impact of the Proposal on the Plan; the appointment of an independent fiduciary to consider the Proposal and make a decision to accept, negotiate, or reject the Proposal by the deadline negotiated by Kroger and the IBT; and appropriate restitution to preserve the value of benefits the Kroger Participants could have received had they been allowed to participate in the new IBT/Kroger multiemployer pension plan contemplated by the Proposal.

156.    Upon information and belief, Director Nyhan's participation is required to fully effectuate the equitable relief sought herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A declaration that the Trustees have breached their fiduciary duties under ERISA; and

B. An accounting and/or expedited discovery under which Defendants are ordered to produce by May 13 (1) all existing reports, studies and documents in draft or final form that they reviewed in making their decision to reject the Proposal, (2) all existing reports, studies and documents in draft or final form that analyzed the Proposal, even if not

considered by the Defendants, and (3) all documents that reflect Defendants'
consideration of the Proposal (but not at this time the underlying information and data
that formed the basis for any such reports or studies); and

C.  The appointment of an independent fiduciary to consider the Proposal and make a
decision to accept, negotiate, or reject the Proposal, including negotiating with Kroger
for an arrangement that is more favorable to all Plan participants, if necessary; and

D.  Appropriate restitution and/or damages to preserve the value of benefits the Kroger
Participants could have received had they been allowed to participate in the plan
contemplated by the Proposal; and

E.  Attorneys' fees; and

F.  Pre-judgment and post-judgment interest; and

G.  Such other relief as the Court deems just and proper.

Dated:  April 25, 2016

DORIS CAMPBELL; TIMOTHY
CAMPBELL; DARRELL CHILDRESS;
DENNIE COOKE; JOE HIGHFIELD;
RUSSELL LEE; WAYNE MOORE; BRAD
DAVIS; AL HERNANDEZ; PAT
NUGENT; AND RANDY SPILLMAN

/s/ Amanda S. Amert
By:  One of Their Attorneys

Craig C. Martin
Amanda S. Amert
Shannon M. Callahan
Caroline A. Lindsey
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Phone: (312) 222-9350
Facsimile: (312) 527-0484
cmartin@jenner.com
aamert@jenner.com
scallahan@jenner.com

clindsey@jenner.com
*Attorneys for Plaintiffs*