UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DORIS CAMPBELL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 16 C 4631 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHARLES A. WHOBREY, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION AND ORDER**

The Plaintiffs are current or former employees of The Kroger Company, which is a nationwide grocery-store giant. The employees are enrolled in the Central States, Southeast and Southwest Areas Pension Plan. They are suing the Plan and its Trustees for an alleged breach of fiduciary duty and retaliation under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*[1] R. 98, First. Am. Supp. Compl.[2] The Plaintiffs assert that the Trustees neglected their duties of prudence and loyalty by refusing to consider a third-party's offer to take on the Plaintiffs' pension liabilities and thereby preserve their retirement benefits. *Id.* They also claim that the Defendants retaliated against them for filing their original complaint in this case by refusing to negotiate over the third-party offer after the complaint's filing. *Id.*, *see also* R. 1, Compl. The Defendants now move to dismiss the retaliation claim, which is Count 3 of the First Amended & Supplemental

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331.
[2]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

Complaint. R. 101, Mot. Dismiss. For the reasons stated below, the motion is granted. Count 3 is dismissed with prejudice.

## I. Background

The Plan is a multiemployer defined-benefit pension plan set up under ERISA. Employers from a variety of industries contribute to the Plan on behalf of their employees. Until December 2017, Kroger contributed to the plan on behalf of certain current and retired employees (the Kroger Participants). The Plaintiffs are Kroger Participants.

At some point before July 2014, Kroger became concerned about the Plan's ability to continue paying the Kroger Participants' retirement benefits. Indeed, the Plaintiffs allege that the Plan is severely underfunded and will soon become insolvent. R. 98, First Am. Supp. Compl. ¶¶ 52-56. On July 2, 2014, Kroger presented "an early version" of a potential lifeline for the Kroger participants (call it the Proposal for convenience's sake); the audience for the presentation were Plan Trustee Charles Whobrey and the Plan's Executive Director, Thomas Nyhan. *Id*. ¶ 79. Kroger and the International Brotherhood of Teamsters, which represents the Kroger Participants in collective bargaining, offered to set up a separate, fully-funded pension plan for the Kroger Participants—including the Plaintiffs. *Id*. ¶¶ 62-64. The new Kroger Plan would have taken on the Plan's liabilities to the Kroger Participants, freeing the Plan from the responsibility to pay the Participants' retirement benefits. *Id*. But there was a catch: in exchange for removing the Kroger Participants from the

Plan, Kroger wanted to be discharged from its duty to pay ERISA's statutory withdrawal liability. *Id.*

Kroger and the Teamsters communicated the Proposal to the Plan Trustees in writing on April 10, 2015. R. 97-16, First Am. Supp. Compl. at Exh. 15, 4/10/15 Withdrawal Ltr. Within five days, the Plan Trustees responded with a letter rejecting the Proposal and laying out their reasons for doing so. R. 97-6, First Am. Supp. Compl. at Exh. 5, 4/15/15 Central States Resp. Ltr. The Trustees explained that they were "not authorized to accept the non-cash consideration offered by Kroger," emphasized that the Fund had a "firm policy against facilitating employer withdrawals in any way," and disputed that the Proposal would leave the Plan better off than if it held Kroger to its duty to make cash withdrawal payments. *Id.* at 1-2.

On April 25, 2016, the Plaintiffs filed their initial complaint in this case. R. 1, Compl. They alleged that the Trustees refused to negotiate over the Proposal or even consider it at all, thereby shirking their fiduciary duties and leaving *all* Plan participants—not just the Kroger Participants—worse off. *Id.* A few days later, the Defendants allowed the original deadline that the Plaintiffs had set for acceptance of the Proposal to pass without acting on it. First Am. Supp. Compl. ¶ 60; *see* R. 97-5, First Am. Supp. Compl. at Exh. 4, 5/5/15 Ltr. of Understanding. On May 4, 2016, apparently in response to the Plaintiffs' filing of their original complaint, Nyhan sent an email to Kroger stating that the trustees would "either negotiate or litigate but not both." R. 97-29, First Am. Supp. Compl. at Exh. 28, 5/4/16 Nyhan Email.

3

Nonetheless, negotiations seem to have continued after that date. On July 18, 2016, Defendant Nyhan met with Kroger and IBT and made a counteroffer to the Proposal. First Am. Supp. Compl. ¶ 104. But Kroger was not satisfied: on July 23, 2016, Kroger sent a letter to the Plan expressing concern that the Plan was not engaging in good-faith negotiation. R. 97-26, First Am. Supp. Compl. at Exh. 25, 7/23/16 Hoffman Ltr.; First Am. Supp. Compl. ¶ 109. Nyhan sent a brief email in response on July 29, 2016, but negotiations stalled until October 21, 2016. R. 97-24, First Am. Supp. Compl. at Exh. 23, 9/29/16 Nyhan Email. At that point, Kroger offered to pay an additional $50-$90 million under the Proposal. R. 97-9, First Am. Supp. Compl. at Exh. 8, 10/21/16 Kroger Counteroffer Ltr. at 4; First Am. Supp. Compl. ¶ 63. Nyhan responded on November 4 proposing additional changes. R. 97-25, First Am. Supp. Compl. at Exh. 24, 11/4/16 Nyhan Ltr.

Negotiations did not advance past that point, and Kroger withdrew from the Plan on December 10, 2017. R. 97-30, First Am. Supp. Compl. at Exh. 29, Settlement Agmt. at 2. Kroger and the Plan signed a settlement agreement on February 2, 2018 in which Kroger agreed to pay $418,546,581.91 for its withdrawal liability. *Id*. at 1, 11; First Am. Supp. Compl. ¶ 3. Under the agreement, the Plan is responsible for paying accrued benefits for Kroger's employees and retirees, and Kroger will "backstop" benefits for participants who were employed on the withdrawal date. First Am. Supp. Compl. ¶ 3.

On April 5, 2018, the Plaintiffs filed a First Amended and Supplemental Complaint. In addition to the claims made in the original complaint, the Plaintiffs

4

added a third count, alleging that the Defendants had violated their rights under ERISA § 510 by refusing to negotiate over the Proposal after they filed their original complaint. First Am. Supp. Compl. ¶¶ 173-81. The Defendants filed a motion to dismiss that new count, arguing that it does not sufficiently plead a violation of § 510. Mot. Dismiss.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

ERISA § 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C § 1140.

### III. Analysis

The Defendants make three primary arguments why Count 3 of the First Amended and Supplemental Complaint should be dismissed. First, they argue that the Plaintiffs did not adequately allege an adverse action under ERISA § 510. Mot. Dismiss at 8-9. Although the Defendants frame it as a distinct argument, they also claim that the behavior alleged by the Plaintiffs is outside the scope of § 510. *Id*. at 14-15. Second, they argue that the Plaintiffs did not adequately allege that the Defendants had a specific intent to interfere with their benefits. *Id*. at 9-12. Third—and finally—they argue that ERISA does not authorize money damages for violations of § 510. *Id*. at 12-14. The Court will address each argument in turn.

## 1. Adverse Action

The Defendants argue that the Plaintiffs have failed to allege that they committed an "adverse action" that violated § 510. Mot. Dismiss at 8-9. The Defendants make two main arguments in support of this claim. First, they contend that they *did* negotiate with Kroger even after the Plaintiffs filed their original complaint. *Id.* at 8. And second, they argue that because their negotiations were against Kroger and not against the Plaintiffs themselves—both before and after the original complaint was filed—their actions could not be adverse to the Plaintiffs. *Id.* at 8-9. The Plaintiffs respond that the Seventh Circuit defines "adverse action" broadly and that they have alleged enough facts to raise an inference of retaliation. R. 106, Pl. Resp. at 1, 6-8.

"Adverse action" is really shorthand for the specific statutory terms in ERISA § 510, which makes it illegal to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising" particular rights (like suing under ERISA). 29 U.S.C. § 1140. The pertinent term at issue in this case is "discriminate." That term does encompass more than the typical punishment that an employer might impose against an employee. Indeed, the Seventh Circuit even has resisted holding that only employers can be liable for violations of § 510. *See Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 826-27 (7th Cir. 2014) ("We are not saying that only employers can be liable for violating § 510—although some of our opinions can be read to suggest as much. As we have recently explained, this language was dicta, and any assumption that only employers

can be liable under § 510 was ill founded.") (cleaned up). What's more, an adverse action (using the shorthand again) under § 510 need not even involve a direct interference with an employment relationship. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675-76 (7th Cir. 2011) (citing *Mattei v. Mattei*, 126 F.3d 794, 807 n.12 (6th Cir. 1997)) (explaining that language in prior cases limiting adverse actions to those that "deliberately [] alter the employment relation" was dicta, and that the language of § 510 leaves room for actions taken outside of the employment relationship or against participants or beneficiaries who are not employees).

But there still are limits to the types of acts that can plausibly be covered by § 510. In both *Teamsters* and *Feinberg*, the Seventh Circuit ultimately held that the plaintiffs had failed to allege adverse actions (that is, discrimination) under § 510. In *Feinberg*, the employer had opted not to assume pension liability for the plaintiffs when it acquired their former employer. *Feinberg*, 629 F.3d at 673. The Seventh Circuit reasoned that the employer could not be held responsible under § 510 for failing to do something it never had any legal obligation to do in the first place and concluded that the employer's choice not to assume the pension liability failed to qualify as discrimination. *Id.* at 675-76 ("A buyer of assets has, with exceptions inapplicable to this case, no obligation to assume the seller's liabilities"). In *Teamsters*, the Seventh Circuit refused to hold the defendant-employer responsible under § 510 when its contractor discharged the plaintiffs, who were employees of the contractor—not of the defendant-employer. *Teamsters*, 741 F.3d at 821. Because the defendant was not the plaintiffs' employer and did not discharge the employees, it

8

could not possibly be liable for the discharge. *Id*. ("Although liability under [§ 510] is not limited to employers, the plaintiffs allege only an unlawful 'discharge,' which presumes an employment relationship. [The defendant was not the plaintiffs' employer], so the district court properly dismissed the § 510 claim."). *Teamsters* and *Feinberg* illustrate that there are limits on what can qualify as discrimination under § 510. At the very least, the challenged conduct must have been committed by the defendant (*Teamsters*) and cannot simply be something that the defendant has an absolute right to do (*Feinberg*).

It might very well be that another limit applies here, specifically, that a viable claim of § 510 discrimination must allege that the defendant treated the plan participants or beneficiaries *differently* from other plan participants or beneficiaries. After all, that is what "discriminate" typically means. *CSX Transp., Inc. v. Alabama Dep't of Revenue*, 562 U.S. 277, 286-87 (2011) ("discriminates" means "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit") (quoting Webster's Third New International Dictionary 648 (1976)). If that meaning were to control here, then the Plaintiffs' retaliation claim would run into the obstacle that the alleged refusal to negotiate presumably does *not* differentiate amongst plan participants, so the Plan is not treating some participants one way and other participants in a different way. Indeed, the Plaintiffs' theory of discrimination is literally unprecedented: the Court has found no similar § 510 case against a Plan for refusing to negotiate with an employer. Having said that, there might be good reasons to interpret the term "discriminate" in a broader way for

9

purposes of an anti-retaliation statute, or in the labor and employment context, *Mattei v. Mattei*, 126 F.3d 794, 803-06 (6th Cir. 1997). In any event, there is no need to decide that question, because the Plaintiffs' retaliation claim fails for an independent reason.

Specifically, the timeline that the Plaintiffs allege simply does not hold together because it is internally inconsistent. The Plaintiffs allege that "[f]ollowing the filing of [the] lawsuit, Defendant Nyhan, writing on behalf of the Trustees, stated that they were not willing to negotiate the Proposal, which would have preserved Plaintiffs' benefits, because of the lawsuit." First Am. Supp. Compl. ¶ 177. But the Plaintiffs also allege that the Defendants refused to negotiate the Proposal *before* they began this lawsuit: "*Before* this lawsuit was filed on April 25, 2016, Defendants simply refused to engage in negotiations with Kroger, and they refused to consider the Proposal." *Id*. ¶ 99 (emphasis added). If anything, the Defendants were *more* willing to negotiate (at least on the surface) after April 25, 2016: "After the lawsuit was filed, Defendants attempted to create the appearance of bargaining in order to gain a litigation advantage." *Id*. For example, before April 2016, the Defendants never made any kind of counteroffer to the Proposal. *Id*. ¶ 102. But after the first complaint was filed, in July 2016, they did. *Id*. ¶¶ 106-07. Ultimately, the Plaintiffs' own allegations of the Defendants' pre-lawsuit refusal to negotiate fatally undermine the plausibility of the retaliation claim, so Count 3 must be dismissed.

10

## 2. Specific Intent

The Defendants also argue that the Complaint fails to allege that "Defendants *intentionally* interfered with [Plaintiffs'] use or attainment of benefits." Mot. Dismiss at 9-12 (emphasis added). Liability under § 510 requires a "*specific intent* to violate the statute and to interfere with an employee's ERISA rights." *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 668 (7th Cir. 2008) (emphasis in original) (quoting *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 892 (7th Cir. 2001)). "The intent to frustrate the attainment of benefits must have been at least a motivating factor for the adverse action against the plan participant." *Teamsters*, 741 F.3d at 826.

The Plaintiffs counter that federal courts "do not require specific intent to be pled with great particularity." Pl. Resp. at 8. The Plaintiffs point to particular facts alleged in the Complaint suggesting that the Defendants intended to interfere with their benefits, particularly Nyhan's May 4, 2016 email, which said that the trustees would "either negotiate or litigate but not both." First Am. Supp. Compl. at Exh. 28, 5/4/16 Nyhan Email; First Am. Supp. Compl. ¶¶ 127, 179; *see* Pl. Resp. at 9.

Whether the Plaintiffs have sufficiently alleged that the Defendants had a specific intent to interfere with the Plaintiffs' benefits is a close question. It is one thing to allege a failure to act prudently or to breach a fiduciary duty, as the Plaintiffs try in the first two Counts. It is quite another to allege that the Defendants specifically *intended* to prevent employees from obtaining their benefits. Again, the Plaintiffs rely on the Nyhan email, which declared that there would be negotiation or

11

litigation, but not both. *See* First Am. Supp. Compl. at Exh. 28, 5/4/16 Nyhan Email. It seems odd to draw an inference, even viewing the allegation in the Plaintiffs' favor, of intent to interfere from that email, because premising the retaliation claim on Nyhan's position puts the defense between a rock and a hard place: as part of the relief sought in this case, the Plaintiffs seek to compel the Plan (through an independent fiduciary) to negotiate with Kroger. First. Am. Supp. Compl. at 49. The Plan objects and so it is defending against the complaint. Yet the Plaintiffs seek to characterize the refusal to negotiate, combined with the defense against the complaint, as specific intent to interfere with the Plaintiffs' benefits. That in effect amounts to a demand that the Plan capitulate to the relief requested lest it face a retaliation claim. Add to that the apparently undisputed fact (though it is not pled in the amended complaint) that Kroger funded the lawsuit, *see* Mot. Dismiss at 1 ("It is undisputed that Kroger funded and directed this lawsuit (including by selecting Plaintiffs' counsel) …"), and the Defendants' refusal to negotiate appears to be a strategy intended to prevent *Kroger's* maneuver in instigating the lawsuit—not one intended to interfere with the *Plaintiffs'* benefits.

In any event, as discussed earlier, because the Plan refused to negotiate even before the lawsuit's filing, there is no plausible retaliation claim and there is no need to definitively decide whether specific intent was adequately alleged.

### 3. Monetary Relief

Finally, the Defendants argue that "the relief [Plaintiffs] seek is not available under ERISA," Mot. Dismiss at 12, and they specifically challenge any form of

12

monetary relief. The remedies for § 510 (codified at 29 U.S.C. § 1140) are limited to those provided in § 502(a)(3), which in turn only provides for injunctive and other "appropriate equitable relief." ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3). *See Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 544 (7th Cir. 1994) ("Made enforceable by participants and beneficiaries through § 502(a)(3), § 510 protects employment relationships from disruptions."); *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1133 (7th Cir. 1992) ("A Section 510 claim is made enforceable through [ERISA] Section 502(a)(3)."). The Plaintiffs respond that equitable remedies can include restitution and other monetary relief, such as unpaid benefits. Pl. Resp. at 9-12. For the sake of completeness and to guide the parties going forward, the Court will discuss this dispute, even though Count 3 is dismissed on other grounds.

On Plaintiffs' request for restitution, § 502(a)(3) only allows money damages when they qualify as "equitable relief." The Plaintiffs point to cases decided by the District Court from 1986 to 2003 allowing broader types of monetary damages under § 510. *See* Pl. Resp. at 9-10. In 2002, however, the Supreme Court held that "for restitution to lie in equity, the action generally must seek … to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002); *see also Montanile v. Bd. of Tr. of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 655 (2016) (holding that a plan fiduciary may not recover expenses under § 502(a)(3) from a "participant's remaining assets" when the participant has already spent any recoverable funds "on nontraceable items"). In 2016, the Seventh Circuit made the requirement even more

13

concrete: to state a viable claim for monetary relief under § 502(a)(3), the plaintiff must "point[] to specifically identifiable funds in the defendant's possession to which an equitable lien could attach." *Cent. States, SE & SW Areas Health & Welfare Fund by Bunte v. Am. Int'l Grp., Inc.*, 840 F.3d 448, 453 (7th Cir. 2016). There is no allegation that the Defendants have that sort of identifiable funds in their possession (much less that they gained them by their alleged refusal to negotiate the Proposal), so the Plaintiffs have no restitution to recover under § 510.

The Plaintiffs assert that the Defendants' damages argument as to Count 3 could apply equally to their breach of fiduciary duty claims because "the same provision of ERISA, § 502(a)(3), authorizes relief for both sets of claims." Pl. Resp. at 11. But that is not right. The Plaintiffs' breach of fiduciary duty claims are governed by 29 U.S.C. § 1109. Section 1109 has a broader set of remedies, described at § 1109(a):

> Any person … shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

29 U.S.C. § 1109(a). Section 1132(a)(3) (ERISA § 502(a)(3)) simply does not apply to claims of breach of fiduciary duty under § 1109. Instead, § 1132 itself explicitly points those claims back to § 1109. 29 U.S.C. § 1132(a)(2) ("A civil action may be brought … by the Secretary, or by a participant, beneficiary, or fiduciary for appropriate relief under section 1109 of this title."). The bottom line is that monetary relief is not available to the Plaintiffs on Count 3.

## IV. Conclusion

For the reasons above, Count 3 of the Plaintiffs' First Amended and Supplemental Complaint is dismissed. The Plaintiffs did not suggest a possible amendment to the claim (and the complaint has already been amended and supplemented), so the dismissal is with prejudice. The parties shall confer about the next step of the litigation (no further discovery was needed on the first two claims, R. 66). By February 4, 2019, the parties shall file a status report on their respective positions on what remains to do in the case. The February 14, 2019 status hearing remains in place.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 14, 2019