IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DORIS CAMPBELL, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 1:16-cv-04631 |
| v. ) | |
| ) | |
| CHARLES A. WHOBREY, *et al.*, ) | The Honorable Edmond E. Chang |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

### DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
### IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendants in the above-captioned action submit the following statement of undisputed facts in support of their Motion for Summary Judgment.[1]

### THE PARTIES

1. Plaintiffs are a group of current and retired employees of The Kroger Co. ("Kroger") or its subsidiary Roundy's, and are participants in the Central States, Southeast and Southwest Areas Pension Fund (the "Fund"). (R. 120 ¶ 11.)

2. The Fund is a multiemployer defined benefit pension plan as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"). (*Id.* ¶ 11.) Defendants Charles A. Whobrey, George J. Westley, Marvin Kropp, Gary Dunham, Arthur H. Bunte, Jr., Gary F. Caldwell, Ronald DeStefano, and Greg R. May (together, the "Trustees") are the trustees of the Fund. (*Id.* ¶ 29.) Defendant Thomas Nyhan is the Executive Director of the Fund. (*Id.* ¶ 31.)

---

[1] Citations to exhibits refer to the exhibits attached to the Declaration of Howard Kaplan filed contemporaneously with this Statement of Undisputed Facts. Citations to the docket are signified with "R." followed by the docket number.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). (R. 120 ¶ 8.)

4. This Court has personal jurisdiction over the parties pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). (R. 120 ¶ 9.)

5. Venue is proper in the Northern District of Illinois pursuant to ERISA § 501(e)(2), 29 U.S.C. 1132(e)(2). (R. 120 ¶ 10.)

## UNDISPUTED FACTS

**Kroger's Original Withdrawal Proposal in 2014**

6. After participating in the Fund since at least 1970, Kroger approached Defendants in June 2014 with a proposal to withdraw from the Fund. (R. 120 ¶ 45; Ex. 2, July 15, 2014 Meeting Minutes.)

7. Under Kroger's proposal, Kroger would withdraw from the Fund and, instead of making the cash withdrawal liability payments otherwise required by statute, Kroger would satisfy its withdrawal liability by assuming the pension obligations owed to Kroger's active, retired, and terminated-vested employees and certain employees of third-party logistics providers to which Kroger had outsourced certain operations ("TPLs"). (Ex. 2, July 15, 2014 Meeting Minutes, at DEF_CENTRALST_000003 ("Kroger's proposal … is to withdraw all of its participants (active, retired and terminated vested), including those from affiliated and third company providers, and transfer all future payment obligations to a new multiemployer fund."); *id.* at DEF_CENTRALST_000006 ("[Kroger's] proposal is apparently to assume the pension obligations owed by the Fund to its active and retired employees in lieu of paying its withdrawal liability.").)

2

8. The Trustees had a meeting on July 15, 2014 to discuss Kroger's proposal, during which they considered a report prepared by the Fund's outside actuaries at Segal Consulting ("Segal"). (Ex. 2, July 15, 2014 Meeting Minutes, at DEF_CENTRALST_000005; Ex. 1, June 30, 2014 Segal Report DEF_CENTRALST_000016–22.)

9. Segal indicated that ▮



(Ex. 2, July 15, 2014 Meeting Minutes, at DEF_CENTRALST_0000006–07; Ex. 1, June 30, 2014 Segal Report, at DEF_CENTRALST_000019 ▮ ).) In addition, Kroger's proposed transfer of liabilities ▮ (Ex. 2, July 15, 2014 Meeting Minutes, at DEF_CENTRALST_000007.)

10. The Trustees voted to decline Kroger's proposal after concluding that "it should be the policy of the Fund that it will not facilitate employer withdrawals." (Ex. 2, July 15, 2014 Meeting Minutes, at DEF_CENTRALST_000007–08.)

**Kroger's Revised Withdrawal Proposal in 2015**

11. Kroger again contacted Defendants in April 2015 about its proposed transfer of liabilities, stating that Kroger's goal was to put the Fund "in a better position" than it would be in if Kroger made cash withdrawal liability payments. (Ex. 4, April 10, 2015 Kroger/IBT Ltr. to T.

3

Nyhan, at DEF_CENTRALST_000040–42.) Kroger also stated that, "[t]o the extent this is not the case, Kroger is prepared to discuss modifying the terms of the transfer and to provide additional consideration in connection with a transfer of the Kroger related benefit liabilities." (*Id.* at DEF_CENTRALST_000042.)

12. Kroger's April 2015 proposal contemplated a transfer only of the liabilities for Kroger's own current and retired employees; it did not contemplate a transfer of the liabilities for Kroger's terminated-vested employees or employees of TPLs. (Ex. 9, July 14, 2015 Meeting Minutes, at DEF_CENTRALST_000060 ("[U]nder this more recent proposal Kroger's new pension plan would only assume the accrued benefits of Kroger's active and retired employees -- and the new Kroger Plan would *not* assume any responsibility for either the employees who are now in terminated-vested status with the Pension Fund, or the employees of Kroger's outsourced companies.").

13. At a meeting that took place on April 14 and 15, 2015, the Trustees reviewed a draft response to Kroger's 2015 proposal prepared by Thomas Nyhan, which explained that "Kroger's proposal … offers only to provide funding for its *current* employees and former employees who are *currently* retired," but "provides no funding for its former employees who have vested benefits with the Pension Fund but are not yet retired" or for "the benefits accrued by the employees of Kroger's 'outsourced' companies." (Ex. 7, April 28, 2015 Interoffice Memorandum from J. Condon to T. Nyhan and M. Angerame, at DEF_CENTRALST_000122; Ex. 5, April 2015 Draft Ltr. from T. Nyhan to Kroger/IBT, at DEF_CENTRALST_000197.)

14. The draft response also noted that Kroger's 2015 proposal would "reduce the Fund's revenues," "cause the Fund to be even more highly leveraged to its assets," and "could result in a rush by certain other employers to withdraw from the Fund, which would only add to

4

the Fund's financial difficulties." (Ex. 5, April 2015 Draft Ltr. from T. Nyhan to Kroger/IBT, at DEF_CENTRALST_000197–198.)

15. The Trustees unanimously voted to reject the proposal for the reasons stated in the draft response. (Ex. 7, April 28, 2015 Interoffice Memorandum from J. Condon to T. Nyhan and M. Angerame, at DEF_CENTRALST_000122; Ex. 6, April 15, 2015 T. Nyhan Ltr. to Kroger/IBT, at DEF_CENTRALST_000049–51.)

16. In May 2015, Segal Consulting prepared an updated "Analysis of Kroger Liability Transfer Proposal" for the Trustees' consideration, which stated that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. 8, May 20, 2015 Segal Report, at DEF_CENTRALST_000308.)

**Defendants' Negotiations With Kroger in 2015–2016**

17. In October 2015, the Fund met with Kroger and the International Brotherhood of Teamsters (the "IBT") to further discuss Kroger's withdrawal proposal. (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000318.)

18. In May 2016, Kroger and the Fund exchanged actuarial data for Kroger and its recently acquired affiliate Roundy's. (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000319.)

19. In June 2016, Kroger stated that it "was willing to consider improving its prior 2015 proposal offer to include a transfer of the liabilities of the TPLs participants and of the terminated-vested Kroger participants." (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000319.)

5

### *Defendants' July 2016 Counterproposal.*

20. On July 15, 2016, Defendants submitted a written counterproposal to Kroger, which they stated was designed to ensure that they were taking "reasonable measures to forestall insolvency" as required under ERISA. (Ex. 11, July 15, 2016 T. Nyhan Ltr. to K. Hoffman, at DEF_CENTRALST_000363.)

21. Defendants' July 2016 counterproposal suggested a transfer to a new plan of the Fund's liability to pay benefits to active, retired, and terminated-vested Kroger participants, as well as the benefits earned by the TPL participants while engaged in servicing Kroger. (Ex. 11, July 15, 2016 T. Nyhan Ltr. to K. Hoffman, at DEF_CENTRALST_000365.)

22. Defendants also proposed that Kroger would also make a lump-sum payment to the Fund, calculated as Kroger and certain TPLs' statutory withdrawal liability reduced by a $321 million credit for the transferred benefit liabilities that would come due before the Fund's projected date of insolvency. (Ex. 11, July 15, 2016 T. Nyhan Ltr. to K. Hoffman, at DEF_CENTRALST_000364–367.)

23. On July 18, 2016, Defendants met with Kroger representatives to continue discussions regarding Kroger's withdrawal from the Fund. (Ex. 12, July 21, 2016 T. Nyhan E-Mail to K. Hoffman, at DEF_CENTRALST_000370.)

24. During the July 18 meeting, the Thomas Nyhan explained to Kroger that "since the Fund will not have the resources to pay the *post*-insolvency pension benefit obligations in any event, transferring those obligations will not relieve the Fund of obligations it would otherwise pay, and therefore the transfer would not benefit the non-Kroger participants." (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000322.)

6

25. Kroger told Defendants at the July 18, 2016 meeting that, if Kroger and other participating employers simply withdrew from the Fund, they would not pay their withdrawal liability in a lump sum. (Ex. 13, July 23, 2016, K. Hoffman Ltr. to T. Nyhan, at DEF_CENTRALST_000374.)

26. However, Kroger acknowledged during the parties' July 2016 negotiations that the Trustees had a "responsibility to maximize Central States' assets." (Ex. 13, July 23, 2016 K. Hoffman Ltr. to T. Nyhan, at DEF_CENTRALST_000376.)

27. Defendants told Kroger that the Fund's counterproposal "was not a final offer and was not extended on a 'take-it-or-leave-it' basis," and they "encourage[d] Kroger to make a meaningful counter to [Defendants'] proposal … that protects the interests of all the Fund's participants." (Ex. 12, July 21, 2016 T. Nyhan E-Mail to K. Hoffman, at DEF_CENTRALST_000370.)

### *Defendants' Continued Evaluation of Kroger's Proposed Liability Transfer.*

28. On September 13, 2016, Defendants met to discuss the status of the Fund's negotiations with Kroger. (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000316.)

29. At the September 13, 2016 meeting, Defendants considered an updated analysis from Segal Consulting, which was ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000325; Ex. 10, May 27, 2016 Segal Report, at DEF_CENTRALST_000399 (████████████████████████████████████████ ████████████████████████████████████████████████████████████████

7

██████████████████████████████████████████████

██████████████████████████████████████).)

30. The Trustees were also advised that Kroger had financial and tax incentives to settle its withdrawal liability through a lump-sum payment instead of making monthly installment payments. (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000322 ("Mr. Nyhan stated that it seemed doubtful that Kroger would ultimately elect to pay the withdrawal liability assessment in installments that stretched over a twenty year period. He noted that most withdrawn employers that, like Kroger, are in good financial condition and have ready access to credit find it more efficient to borrow money at relatively low interest rates in order to pay their withdrawal liability assessments in a lump sum. He note that paying in a lump sum often has tax advantages for the employers as well."); *id.* at DEF_CENTRALST_000325 ("Staff believes that there is a fair chance that Kroger will eventually change its position and agree to pay the withdrawal liability at issue in a lump sum, rather than in installments over a 20 year period."); *id*. at DEF_CENTRALST_000332 ("Although Kroger insists that at this point in time it would elect to pay its withdrawal liability in installments rather than in a lump sum, many employers in circumstances similar to Kroger's have recognized that there are significant financial advantages to negotiating with the Fund for a lump sum payment that will satisfy their withdrawal liability … Thomas Nyhan then noted that there are likely to be significant tax advantages for Kroger in making a lump sum payment of its withdrawal liability, and that this is another reason to suspect that Kroger will eventually want to settle its withdrawal liability in a lump sum.").)

31. Defendants also had discussions with financial consultants and institutions concerning the likelihood that the Fund could, as a practical matter, successfully market Kroger's

8

withdrawal liability installment payment obligations for a lump-sum payment. (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000328–329.) The Fund's ERISA counsel, financial advisors, and an investment bank indicated that "if Kroger insisted on paying withdrawal liability in installments over a 20 year period, it was likely the Pension Fund could assign Kroger's stream of installment payments in exchange for a lump sum payment from a financial institution (or a consortium of financial institutions) on reasonable terms." (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000452.)

32. The Trustees also considered that it was "by no means certain that Kroger will refuse to transfer or 'back-stop' the benefits of the Kroger and TPL participants simply because the Fund rejects Kroger's terms," because "if no agreement is reached between Kroger and the Pension Fund, Kroger and the IBT must return to the bargaining table and negotiate the issue of the long-term protection of the bargaining unit's Central States pension benefits." (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000330.)

33. The Trustees concluded that accepting Kroger's proposed transfer of liabilities would be "unfair to the main body of the Fund's participants," and that "cash payments of withdrawal liability will allow the Fund to continue to pay benefits for a longer period, as compared to Kroger's proposed liability transfer, and will thus benefit *all* of the Fund's participants." (Ex. 14, September 13, 2016 Meeting Minutes, at DEF_CENTRALST_000330; *id.* at DEF_CENTRALST_000329 ("There are approximately 9,200 Kroger and TPL participants … Although the Trustees would very much prefer to rescue the Kroger participants from any reduction or loss of their benefits, the Trustees must consider the interests of the participant population of the Pension Fund as a whole -- which totals approximately 400,000 persons.").)

*Kroger's Revised Proposal and Defendants' Counteroffer.*

34. Kroger responded to the Fund's counteroffer in October 2016, offering a cash payment of $50 to $90 million in addition to its proposed transfer of liabilities. (Ex. 15, October 21, 2016 K. Hoffman Ltr. to T. Nyhan, at 4; Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000451 ("Kroger responded with a counter-offer that included a 'cash payment of $50 to $90 million on top of the transfer of benefit obligations.'").)

35. In November 2016, the Fund reduced its prior demand "in recognition of Kroger's willingness … to provide cash payments of $50 - $90 million," and offered to provide Kroger an additional credit against its cash payment for approximately 10% of the transferred liabilities that would come due after the Fund's projected date of insolvency. (Ex. 16, November 4, 2016 T. Nyhan Ltr. to K. Hoffman, at 5; Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000451–452.).

36. Kroger never made a counter to the Fund's November 2016 proposal. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000452–453.).

37. In February 2017, Kroger and the IBT entered into an agreement permitting Kroger to withdraw from the Fund after September 2017. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000452.) Kroger "promised a 'make-whole' remedy for the Fund participants who were at that time actively employed by Kroger," which "indemnified the active Kroger participants against any loss or reduction in their Pension Fund benefits, except for any portion of those benefits that is supposed to be backstopped by the Pension Benefit Guarantee Corporation." (*Id.* at DEF_CENTRALST_000452–453.)

**Defendants' Settlement With Kroger in 2018**

38. In December 2017, Kroger withdrew from the Fund. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000453.).

39. In December 2017, Southstar LLC, a third-party logistics provider, also withdrew from the Fund. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000453.).

40. In January 2018, the Fund sent Kroger a notice and demand for payment of withdrawal liability in the amount of approximately $1.029 billion, under which Kroger would be required to pay the Fund monthly installments of $2,841,001.39 per month for twenty years. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000453.)

41. On January 5, 2018, Kroger's counsel sent an e-mail to the Pension Fund indicating that Kroger was interested in attempting to resolve its withdrawal liability by the close of its fiscal year by means of a lump sum payment. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000454.). Kroger later indicated that it wanted the deal to include a settlement of the withdrawal liability for Southstar LLC. (*Id.* at DEF_CENTRALST_000456.)

42. The Fund and Kroger negotiated the terms of a settlement of Kroger's withdrawal liability throughout January 2018. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000457.)

43. The Fund "strongly urged Kroger to offer a backstop of some type against a loss or reduction in the Pension Fund's benefits to the [ ] Plaintiffs" in this case and to those similarly situated, "in order to secure the Plaintiffs' consent to a dismissal while gaining improved or more secure benefits for the Kroger participants." (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000459–460.). But Kroger "steadfastly rejected that option." (*Id.* at DEF_CENTRALST_000460.)

11

44. On January 31, 2018, a special telephonic meeting of the Trustees was convened for the purpose of reviewing a proposed settlement with Kroger under which Kroger would make a lump sum payment of approximately $467 million, less interim withdrawal liability payments which had become due and were paid by Kroger and Southstar LLC during the January 2018 negotiations. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000448, 457.)

45. Thomas Nyhan advised the Trustees that the proposed settlement was "highly favorable to the Pension Fund" and that there was an "inherent value for the Fund in achieving a lump sum settlement with Kroger," because "[i]f Kroger refused a lump sum deal … and simply paid in accordance with the twenty year payment schedules, approximately half of the value of the withdrawal liability assessments would be paid after the Fund is projected to become insolvent … therefore those post-solvency payments would not further the Fund's statutory goal and duty to take reasonable measures to forestall insolvency." (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000458–459.)

46. Although the Fund's actuaries had not prepared a final analysis of the impact of the proposed settlement on the Fund's projected insolvency, it was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000459.)

47. The Trustees approved the proposed settlement, and on February 2, 2018, the Fund entered into settlement agreements with Kroger and Southstar LLC pursuant to which Kroger agreed to make a lump-sum payment of approximately $467 million to the Fund. (Ex. 17, January 31, 2018 Meeting Minutes, at DEF_CENTRALST_000461; Ex. 18, February 2, 2018 Kroger Settlement Agreement, at DEF_CENTRALST_504–505; Ex. 19, February 2, 2018 Southstar LLC Settlement Agreement, at DEF_CENTRALST_517–518.)

48. The Settlement Agreement with Kroger allocated $1,000,000 of Kroger's payment to Defendants' fees and costs incurred in this action. (Ex. 18, February 2, 2018 Kroger Settlement Agreement, at DEF_CENTRALST_504.)

**Kroger's Involvement In This Lawsuit**

49. Kroger has provided the funding for Plaintiffs to pursue their claims since the beginning of this case, and Kroger selected Plaintiffs' counsel. (Ex. 3, March 20, 2015 Kroger Ltr. to IBT, at DEF_CENTRALST_000355–356; Ex. 18, February 2, 2018 Kroger Settlement Agreement, at DEF_CENTRALST_000505 ("Kroger is obligated to pay up to a maximum of $900,000 in expenses in connection with the Campbell Fiduciary Claim.").)

50. As of the date of the Settlement Agreement, Kroger remained obligated to provide $255,039.68 to Plaintiffs in connection with this case. (Ex. 18, February 2, 2018 Kroger Settlement Agreement, at DEF_CENTRALST_000505.). As part of the settlement, Kroger agreed not to provide any additional funding to Plaintiffs beyond that amount. (*Id.* at DEF_CENTRALST_000505–506.)

**Certain Plaintiffs' Voluntary Dismissal With Prejudice**

51. On February 1, 2019, defense counsel wrote to Plaintiffs' counsel, informing Plaintiffs of Defendants' intent to seek attorney fees and costs at the conclusion of the case, should Plaintiffs continue pursuing their claims. (Ex. 20, February 1, 2019 B. Weidenhammer Ltr. to A. Amert, at 1–2.) Six Plaintiffs subsequently dismissed their claims voluntarily, with prejudice. (R. 128.)

DATED:  March 22, 2019	Respectfully submitted,

/s/ *Bradley H. Weidenhammer*
James F. Hurst (ARDC # 6202190)
Kevin T. Van Wart, P.C. (ARDC # 6183921)
Bradley H. Weidenhammer (ARDC # 6284229)
Howard Kaplan (ARDC # 6306286)
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

-and-

James P. Condon (ARDC #03126986)
Robert A. Coco (ARDC #06194766)
John J. Franczyk, Jr. (ARDC #06224947)
9377 West Higgins Road
Rosemont, IL 60018

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Bradley H. Weidenhammer, an attorney, certify that on this 22nd day of March, 2019, I caused a copy of the foregoing to be served through the Court's ECF system, which will serve all counsel of record.

*/s/ Bradley H. Weidenhammer*
Bradley H. Weidenhammer
