# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DORIS CAMPBELL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 16 C 4631 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHARLES A. WHOBREY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Current and former employees of The Kroger Company, the nationwide grocery-store chain, sued the Central States, Southeast and Southwest Areas Pension Fund (in which they are enrolled) for how it handled Kroger's withdrawal from the fund, complaining that Central States breached its fiduciary duty to the employees. R. 149, PSOF ¶ 1.[1] The claims for breach of fiduciary duty (Counts 1 and 2 of the operative complaint)[2] are brought under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*[3] R. 98, Am. Suppl. Compl.[4]

---

[1] Citations to the parties' Local Rule 56.1 Statements of Fact will be identified as follows: "R. 136-1, DSOF" for the public, redacted Defendants' statement of facts ["R. 137-1 (Sealed), DSOF" for the unredacted version]; "R. 149, PSOF" for the public, redacted Plaintiffs' statement of additional facts and their statement of facts in support of their motion for summary judgment ["R. 150 (Sealed), PSOF" for the unredacted version]; "R. 153, Pls.' Resp. DSOF" for the public, redacted Plaintiffs' response to the Defendants' statement of facts ["R. 154 (Sealed), Pls.' Resp. DSOF" for the unredacted version]; and "R. 162, Defs.' Resp. PSOF" for the public, redacted Defendants' response to the Plaintiffs' statement of facts and statement of additional facts ["R. 163 (Sealed), Defs.' Resp. PSOF" for the unredacted version].

[2] A claim for retaliation (Count 3) was dismissed in January 2019. R. 119.

[3] The Court has federal-question subject matter jurisdiction under 28 U.S.C. § 1331.

[4] Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

After engaging in discovery, both sides have moved for summary judgment. R. 134; R. 143. The Plaintiffs also filed a motion under Federal Rule of Civil Procedure 56(d), asking this Court to deny or defer ruling on the Defendants' summary judgment motion and to allow additional discovery. R. 144. For the reasons discussed below, the Defendants' motion for summary judgment is granted, and the Plaintiffs' motions are both denied.

## I. Background

The facts narrated here are undisputed unless otherwise noted. In deciding cross-motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So, when the Court evaluates the Defendants' summary judgment motion, the Plaintiffs get the benefit of reasonable inferences; conversely, when evaluating the Plaintiffs' filing, the Court gives the Defendants the benefit of the doubt.

The Central States, Southeast and Southwest Areas Pension Fund ("the Plan" or "the Fund") is a multiemployer defined-benefit pension plan set up under ERISA. PSOF ¶ 2. Employers from a variety of industries contribute to the Fund on behalf of their employees. On its current course, the Fund will become insolvent in around five years. *Id.* ¶ 6. Until December 2017, Kroger contributed to the Fund on behalf of certain current and retired employees (call them the "Kroger Participants")— including the Plaintiffs—of Kroger and its subsidiary Roundy's. *See id.* ¶ 2.

## A. 2014 Proposal

In June 2014, Kroger and the International Brotherhood of Teamsters (IBT), which represents the Kroger Participants in collective bargaining, approached the Defendants with a proposal to withdraw from the Fund. *See* R. 153, Pls.' Resp. DSOF ¶ 6; R. 137-2 (Sealed), Defs.' Exh. 1 at 4, 7.[56] The Proposal offered to set up a separate, fully funded pension plan for Kroger Participants—that is, active, retired, and terminated-vested employees, and certain employees of third-party logistics providers (TPLs) to which Kroger had outsourced some operations. R. 136-1, DSOF ¶ 7. In exchange for freeing the Fund from its pension obligations to these participants (around 8,044 out of 407,713 total Plan participants), Kroger wanted the Fund to discharge it from its statutory duty to make cash withdrawal-liability payments under ERISA. *Id.*; R. 137-2 (Sealed), Defs.' Exh. 1 at 4, 7.

The Fund's Trustees held a Pension Board Meeting to discuss the Proposal in mid-July 2014, during which they were provided with a report on the financial impact of the Proposal prepared by Segal Consulting. R. 150 (Sealed), PSOF ¶¶ 15-16; R. 152 (Sealed), Pls.' Exh. 1 at 2, 7-8. The 2014 Segal Report concluded that the Proposal would delay the Fund's insolvency by one month, and the Fund would benefit from an approximately $97 million increase in present value of net cash flows through May

---

[5]For ease of reference, citations to the parties' exhibits will use the page numbers assigned by the electronic filing system as opposed to the internal numbering (such as the bates numbers, for example).

[6]The Court cites to some sealed filings, but the information disclosed in this Opinion cannot be justifiably sealed under the requirements of well-established Circuit law. *Baxter Int'l v. Abbott Labs.*, 297 F.3d 544, 546-47 (7th Cir. 2002); *Union Oil v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000). Where possible, the Court has cited to the public, redacted version of the filings.

2026. R. 150 (Sealed), PSOF ¶ 17; R. 137-2 (Sealed), Defs.' Exh. 1 at 4. But the Report also stated that Kroger's withdrawal under the Proposal would cause the Fund to lose employment base, becoming more leveraged and adding risk, which might be exacerbated if other employers followed suit and withdrew. R. 150 (Sealed), PSOF ¶ 18; R. 137-2 (Sealed), Defs.' Exh. 1 at 2-5. The Plaintiffs point out that the Report also projected a 20-month delay of insolvency and $1.5 billion increase in present value of net cash flows if other food-industry employers transferred liability out of the Fund. R. 150 (Sealed), PSOF ¶ 18; R. 137-2 (Sealed), Defs.' Exh. 1 at 2-5. But the Defendants respond that this projection (1) did not take the increase in leverage and risk into consideration; and (2) did not evaluate the impact of additional withdrawals by *non*-food industry employers. R. 163 (Sealed), Defs.' Resp. PSOF ¶ 18; R. 137-2 (Sealed), Defs.' Exh. 1 at 2-5.

In any event, as reported in the minutes from the July 2014 meeting, the Trustees engaged in a "full discussion" of the 2014 Proposal. R. 137-3 (Sealed), Defs.' Exh. 2 at 9. Specifically, the meeting minutes[7] say that the Segal Report was "distributed and discussed"; the Trustees listened to a presentation from Defendant Thomas Nyhan, the Executive Director of the Fund, concerning the Proposal; and the Trustees heard the input of Trustee Charles Whobrey (a defendant in this case), who

---

[7]The Plaintiffs make a broad argument that "the Record consists largely of self-serving hearsay evidence that is not sufficient to meet Defendants' burden on summary judgment." R. 147, Pls.' Opening/Resp. Br. at 14. But the Record here consists of meeting minutes, as well as course-of-business letters and emails discussing the Proposal, all of which qualify for the business-records exception. Fed. R. Evid. 803(6); *Ernst v. City of Chicago*, 837 F.3d 788, 805 ("Meeting minutes properly fall within the business-records exception."). The Plaintiffs do not explain why these records are not covered by Rule 803(6).

advocated against the facilitation of employer withdrawals. R. 137-3 (Sealed), Defs.' Exh. 2 at 6-8. Although the Plaintiffs claim that the Trustees "took no substantive action relating to the Proposal after this 2014 discussion[,]" R. 150 (Sealed), PSOF ¶ 20, a timeline of events from 2016 shows that the Trustees voted to reject the 2014 Proposal at the July 2014 meeting, R. 162, Defs.' Resp. PSOF ¶ 20; R. 152 (Sealed), Pls.' Exh. 1 at 318. The Trustees also voted to reject Kroger's request for a copy of the Fund's actuarial analysis. R. 163 (Sealed), PSOF ¶ 20; R. 152 (Sealed), Pls.' Exh. 1 at 9.

### B. 2015 Proposal

In early April 2015, Kroger and IBT submitted another proposal to the Board of Trustees (via a letter to Nyhan). *See* R. 162, Defs.' Resp. PSOF ¶ 21. Unlike the June 2014 Proposal, this one contemplated a transfer of liabilities only for Kroger's own current and retired employees, and not for Kroger's terminated-vested employees or employees of third-party providers. *Id.*; *compare* R. 137-3 (Sealed), Defs.' Exh. 2 at 4-5, *with* R. 136-6, Defs.' Exh. 4 at 3. In addition, if the pension liabilities of Kroger's current and retired employees did not amount to 22 years' worth of withdrawal liability payments, Kroger offered to "make a lump sum cash payment equal to the difference." R. 136-6, Defs.' Exh. 4 at 3. Kroger represented that this would put the Fund in a better position than if Kroger simply made withdrawal liability payments for the 20-year statutory period. *Id.*

Four days later, a Trustee Subcommittee meeting was held to discuss this 2015 Proposal. R. 150 (Sealed), PSOF ¶ 22. Despite it being a "subcommittee," the meeting

constituted a quorum of trustees (that is, two trustees representing employers and two representing employees), a prerequisite for any business action under the Trust Agreement. *See* R. 152 (Sealed), Pls.' Exh. 1 at 113, 286; R. 97-2, Am. Suppl. Compl., Exh. 1 (Trust Agreement) at 24. The Trustees unanimously rejected the 2015 Proposal, for the reasons stated in a detailed, draft response letter that Nyhan circulated at the meeting. R. 152 (Sealed), Pls.' Exh. 1 at 123. These reasons included: (1) the Fund's net asset balance would be negatively affected by the Proposal; (2) the Proposal undermines the MPAA requirement that each employer bear a proportional share of the underfunding of the Fund, because a large portion of the underfunding is attributable to "orphan" participants (participants whose employers withdrew and failed to pay their withdrawal liability); (3) the Proposal would reduce the Fund's revenues and exacerbate the decline of active participants in comparison to retirees, which could cause "more deep and painful benefit suspensions"; (4) the Fund has a "firm policy against facilitating employer withdrawals in any way"; and (5) the Proposal could result in other employers withdrawing from the Fund. *See* R. 136-7, Defs.' Exh. 5 at 2-4. It is worth noting that, in the four days between the receipt of the letter and the final vote, there is no evidence that the Trustees commissioned or received any actuarial or outside analysis specific to the 2015 Proposal. *See* R. 150 (Sealed), PSOF ¶ 23. Instead, the Trustees apparently "drew upon the actuarial and Staff analysis of the 2014 Proposal" when making their decision, R. 163 (Sealed), Defs.' Resp. PSOF ¶ 23; R. 152 (Sealed), Pls.' Exh. 1 at 318. Nyhan sent a final version

of the draft rejection letter to Kroger and IBT on April 15, 2015. R. 136-8, Defs.' Exh. 6.

Around three weeks later, in May 2015, Kroger and IBT replied to the Trustees' letter, disputing the Trustees' various reasons for rejecting the Proposal. R. 149, PSOF ¶ 25. For example, Kroger and IBT argued that: a transfer of liabilities would *not* diminish plan assets, but would simply remove liabilities; they would be willing to modify the Proposal to ensure that a transfer would ultimately benefit the Plan; and the issue of orphan participants is not relevant to withdrawal liability under ERISA. R. 152 (Sealed), Pls.' Exh. 1 at 55-57; *see* R. 149, PSOF ¶ 25.

A Trustee Subcommittee met two weeks later, on May 20, in order to further discuss the 2015 Proposal. R. 149, PSOF ¶ 26. The meeting minutes say that the Fund's staff, "pursuant to the Trustees' direction[,]" had already rejected the 2015 Proposal. R. 152 (Sealed), Pls.' Exh. 1 at 62. Nevertheless, a May 2015 analysis of the Proposal, prepared by Segal Consulting, was distributed and discussed. *See* R. 150 (Sealed), PSOF ¶ 28; R. 152 (Sealed), Pls.' Exh. 1 at 63, 84-91. The new Segal analysis essentially showed that a liability transfer excluding outsourced employees, such as the 2015 Proposal, would result in a *lower* increase in net cash outflow than if Kroger simply withdrew and made liability payments that also excluded outsourced employees. *See* R. 152 (Sealed), Pls.' Exh. 1 at 87-88. In other words, if outsourced employees were excluded, the Proposal would be better for the Fund than withdrawal-liability payments. On the other hand, if Kroger made withdrawal-liability payments covering outsourced participants, then that would be better for the

Fund than if Kroger transferred liabilities (whether the transfer included outsourced employees or not). *See id.* The record does not show that the Trustees took any further action on the 2015 Proposal at the May 20 meeting. *See id.* at 63.

Several months later, in mid-July 2015, the Trustees again discussed the 2015 Proposal at another Pension Board meeting. R. 149, PSOF ¶ 30; R. 152 (Sealed), Pls.' Exh. 1 at 63-64. The minutes reflect that the Fund's staff planned to "gather more information from Kroger … concerning its contracts and relationships with the companies to which it has outsourced much of its warehouse operations, and for other information concerning Kroger's operations and its plan to withdraw from the Fund. … Staff hopes to meet with Kroger representatives to discuss these issues and to attempt a resolution of them." R. 152 (Sealed), Pls.' Exh. 1 at 63-64. And in fact, a week later, Nyhan "requested additional information from Kroger, including Kroger's agreements" with the TPLs. R. 137-7 (Sealed), Defs.' Exh. 14 at 4. In October 2015, Kroger produced documents in response to the request. *Id.* Moreover, the Pension Board's September 2016 chronology also shows that, in October 2015, the "Pension Fund met with Kroger and the IBT to further discuss Kroger's withdrawal proposal[,]" at which time Nyhan "also requested any undisclosed Kroger-IBT side-agreements concerning withdrawal." *Id.*; *see also* R. 136-1, DSOF ¶ 17. Ultimately, in mid-January 2016, Nyhan told the Trustees that "in recent discussions with representatives of Kroger and the IBT, the Fund has communicated that it will not facilitate withdrawals from the Fund by Kroger or any other contributing employers."

R. 152 (Sealed), Pls.' Exh. 1 at 95; *see also* R. 149, PSOF ¶ 31. The Plaintiffs filed this case in April 2016. R. 150 (Sealed), PSOF ¶ 35.

### C. 2016 Counterproposal

A couple of months later, in June 2016, Kroger and IBT informed the Trustees that they would be "willing to consider improving [the] prior 2015 proposal offer to include a transfer of the liabilities of the TPLs [third-party logistics] participants and of the terminated-vested Kroger participants." R. 136-1, DSOF ¶ 19. In fact, the record suggests that Kroger had an agreement with IBT that Kroger could not withdraw from the Fund unless it negotiated terms protecting the Kroger Participants, and an agreement to fund and control this lawsuit should the Fund reject Kroger's proposed withdrawal terms. R. 152 (Sealed), Pls.' Exh. 1 at 320.[8] The Pension Fund agreed to meet with Kroger to discuss a revised proposal. *Id.*

In preparation for the upcoming meeting with Kroger, Nyhan submitted a written counterproposal to Kroger's 2015 offer, stating that although "the Pension

---

[8]The Plaintiffs dispute that the Fund and Kroger exchanged this information, arguing that the Defendants "did not provide that data and the Record contains no original evidence of its being exchanged." R. 147, Pls.' Opening/Resp. Br. at 13; *see* R. 153, Pls.' Resp. DSOF ¶ 18. For support, the Plaintiffs cite *Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at *4 (N.D. Cal. Feb. 8, 2019), R. 147, Pls.' Opening/Resp. Br. at 13, but—aside from being non-controlling—this case is distinguishable from the facts here. In *Dorman*, although the district court found that the absence of a certain report gave rise to an inference that the fiduciary either never received it or disregarded it, it did so absent any other evidence that the fiduciary received or considered the report. *Dorman*, 2019 WL 580785 at *4. In contrast, the record here contains a chronology of events from September 2016 showing that Kroger and the Fund exchanged documents, and in fact, the chronology contains information that the Fund was unlikely to possess absent such an exchange. *See* R. 152 (Sealed), Pls.' Exh. 1 at 320. Post-complaint evidence is still evidence, and had the Plaintiffs sought depositions of the Trustees, they would be relying on that testimony even though it would have been obtained after the lawsuit was filed. Ultimately, the Plaintiffs have failed to rebut or dispute the facts contained in the September 2016 meeting minutes.

Fund's Trustees possess the final authority to enter into compromises impacting withdrawal liability … [he would be] willing to recommend that the Trustees accept the terms outlined" in the counterproposal. R. 152 (Sealed), Pls.' Exh. 1 at 363. *See* R. 163 (Sealed), Defs.' Resp. PSOF ¶ 35; R. 137-7 (Sealed), Defs.' Exh. 14 at 5 (September 2016 chronology stating that Nyhan had forwarded the July 2016 counterproposal "to the Trustees for their review and comments prior to publication."). It is not clear from the record whether anyone from the Fund—aside from Nyhan—attended the July 2016 meeting with Kroger. *See* R. 153, Pls.' Resp. DSOF ¶ 17; R. 137-7 (Sealed), Defs.' Exh. 14 at 7-9. But it is undisputed that, at this meeting, "Kroger told Defendants that … if Kroger and other participating employers simply withdrew from the Fund, they would not pay their withdrawal liability in a lump sum." R. 136-1, DSOF ¶ 25.

In any event, Nyhan's counterproposal—in addition to letting Kroger withdraw from the Fund early—contemplated a transfer of liabilities for all Kroger Participants (including third-party logistics employees) and a lump-sum settlement payment of $581,410,707. R. 152 (Sealed), Pls.' Exh. 1 at 363-68. Broken down, this proposed lump-sum payment would comprise:

> (1) the contributions Kroger would have paid to the Fund from January-September 2017 ($13,238,311);
>
> (2) 22-years' worth of withdrawal-liability payments ($433,626,858);
>
> (3) the contributions that the third-party logistics companies would have paid under each company's collective bargaining agreement ($53,748,096);
>
> (4) 22-years' worth of withdrawal-liability payments on behalf of the third-party logistics companies ($401,537,442); and

(5) $260,000 in estimated fees and expenses related to the Plaintiffs' case;

(6) *minus* a credit of $321 million, representing the Kroger Participants' pension liabilities that the Fund would be responsible for prior to the projected date of insolvency, and that Kroger would transfer to its new pension plan.

*Id.*

In an email sent later that July, Nyhan emphasized that the counterproposal "was not a final offer and was not extended on a 'take-it-or-leave-it' basis" and he "encourage[d] Kroger to make a meaningful counter … that protects the interests of all the Fund's participants … ." R. 136-14, Defs.' Exh. 12 at 2. Nyhan also mentioned Kroger's inquiry about whether "the Fund would consider a proposal that involved mid-contract terminations … of participation in the Pension Fund" by the third-party logistics companies. *Id.* Nyhan then "confirm[ed] that the Fund *would* consider a proposal of that nature." *Id.* (emphasis added). But two days after this email, Kroger responded with a letter rejecting the counterproposal. R. 136-15, Defs.' Exh. 13. *Cf.* R. 136-14, Defs.' Exh. 12 at 2 (email from Nyhan suggesting that Kroger had already rejected the counterproposal at the meeting). One of Kroger's main contentions was that the counterproposal did not provide credit for benefit liabilities payable after the date of insolvency—so it would only give Kroger credit for $321 million, even though Kroger's Proposal contemplated transferring about $684.5 million in benefit liabilities. R. 136-15, Defs.' Exh. 13 at 3. According to Kroger, the counterproposal was "grossly disproportionate" and may have given "the appearance of a negotiation, but … [was] so unrealistic, it [was] as if no offer was made at all." R. 152 (Sealed), Pls.' Exh. 1 at 377. Nyhan updated the Trustees on these latest events at a meeting

of the Pension Board that same week. R. 150 (Sealed), PSOF ¶ 37; R. 152 (Sealed), Pls.' Exh. 1 at 313.

A few months later, in mid-September 2016, the Trustees discussed Kroger's proposal at another meeting of the Pension Board. R. 150 (Sealed), PSOF ¶ 39. The Trustees acknowledged that the Kroger Participants "would likely benefit a great deal if that transfer were to take place." R. 152 (Sealed), Pls.' Exh. 1 at 330. They also recognized that because both the Fund and the Pension Benefit Guaranty Corporation were projected to become insolvent around the same time, the Kroger Participants, "like all other fund participants, face the very substantial risk that when the Fund becomes insolvent pension payments from the Fund will be reduced to zero." *Id.* But although the Trustees would have "prefer[red] to rescue the Kroger participants[,]" they maintained that "[i]t would cause injury to the non-Kroger participants to forgive Kroger's cash payment obligations in exchange for Kroger's promise to remove post-insolvency liabilities that will never be paid in any event." *Id.* at 330-31. Plus, Fund Staff informed the Trustees that "there is a fair chance" that Kroger would eventually agree to pay its withdrawal liability in a lump sum (given the tax advantages that would provide Kroger). *Id.* 323, 326. But even if Kroger simply withdrew without making a lump-sum payment, "the present value of the installment payments … made *before* the Fund's projected insolvency" would be $79 million *more* than the $321 million in pre-insolvency cash flow relief that the Fund would be forgoing by rejecting the Proposal. *Id.* at 324. Ultimately, the Trustees believed that "Kroger's cash payments of withdrawal liability [would] allow the Fund

to continue to pay benefits for a longer period, as compared to Kroger's proposed liability transfer, and will thus benefit *all* of the Fund's participants." *Id.* at 331.

In October 2016, Kroger informed the Fund that it would be prepared to accept (and to recommend to the TPLs) one of the following three options: (1) a withdrawal-liability settlement for periodic cash payments equal to what would be required under ERISA, with payments guaranteed by Kroger, but no accelerated payments absent a mass withdrawal of employers; (2) a modified transfer proposal in which Kroger would transfer the benefit liabilities of all active, retired, and terminated-vested employees related to Kroger, Roundy's, and TPLs, plus a lump-sum cash payment of $50 million; or (3) a modified transfer proposal that would limit the transferred liabilities of Kroger/Roundy's/TPLs to active and retired participants, plus a lump-sum payment to the Fund of $90 million. R. 136-17, Defs.' Exh. 15 at 5. Nyhan's response in November was, essentially, to reduce the Fund's July 2016 counteroffer from $604,387,068 to $544,315,294. R. 136-18, Defs.' Exh. 16 at 6. *See also id.* at 2 ("Although I cannot recommend that the Central States Pension Fund Trustees accept your October 21st offer, in this letter I have outlined a counterproposal that I can recommend to the Fund's Trustees.").

### D. 2017 Negotiations and Final Settlement

Months later, in February 2017, "Kroger and the IBT entered into an agreement permitting Kroger to withdraw from the Fund after September 2017. Kroger promised a make-whole remedy for the Fund participants who were at that time actively employed by Kroger, which indemnified the active Kroger participants

against any loss or reduction in their Pension Fund benefits, except for any portion of those benefits that [was] supposed to be backstopped by the Pension Benefit Guarantee Corporation." R. 136-1, DSOF ¶ 37 (cleaned up).[9] In early December 2017, Kroger withdrew from the Fund "by incurring a cash withdrawal liability—a statutory procedure that did not require the trustees' cooperation." R. 149, PSOF ¶ 43. The next month, the Fund sent Kroger a notice and demand for payment of $1.029 billion in withdrawal liability, "under which Kroger would be required to pay … monthly installments of $2,841,001.39 … for twenty years." R. 136-1, DSOF ¶ 40. Due to the statutory 20-year period on withdrawal-liability payments, the Fund would only end up getting around $700 million of the $1.029 billion demand. *See, e.g.*, R. 137-8 (Sealed), Defs.' Exh. 17 at 7. In the end, after some negotiation, the Fund settled with Kroger for a lump-sum payment of $467 million. *See* R. 136-1, DSOF ¶ 47; R. 137-8 (Sealed), Defs.' Exh. 17 at 15; R. 136-20, Defs.' Exh. 18 at 4-5; R. 136-21, Defs.' Exh. 19 at 5-6. Although the record does not contain an actuarial analysis on the impact of the settlement, the Trustees "believed that the settlement [would] push back the Fund's projected date of insolvency by at least two months." R. 137-1 (Sealed), DSOF ¶ 46; R. 137-8 (Sealed), Defs.' Exh. 17 at 13.

## II. Motion for Additional Discovery

Before turning to the substance of the parties' cross-motions for summary judgment, it is necessary to address the Plaintiffs' Rule 56(d) request for additional

---

[9]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

discovery. *See* R. 145, Pls.' Rule 56(d) Mot. The Plaintiffs argue that they "cannot present *all* facts essential to support their opposition to Defendants' motion because they have not been allowed to take necessary discovery." *Id.* at 2 (emphasis in original). They repeatedly denigrate the factual record as "selected and tailored by Defendants." *See* R. 169, Pls.' Summ. J. Reply Br. at 6; *see also, e.g.*, R. 147, Pls.' Opening/Resp. Br. at 12; R. 172, Pls.' Rule 56(d) Reply Br. at 1. But this argument comes too late. Discovery in this case closed on September 27, 2017, when *both* sides reported that no further discovery was needed. R. 66, Sept. 27, 2017 Minute Entry. *See also* R. 124, Feb. 4, 2019 Joint Status Rep. ("In light of the Court's order limiting discovery … Plaintiffs do not intend to serve additional discovery."). The Plaintiffs fail to explain why they waited well after the *close* of discovery to make a Rule 56(d) request, after they reported that discovery was finished.

Instead, the Plaintiffs place the blame on the June 30, 2017 Order that placed certain limits on the scope of discovery. *See* Pls.' Rule 56(d) Mot. at 1-4. But that Order gave the Plaintiffs the opportunity to ask for more discovery. Specifically, discovery was limited "*in the first instance*" to "(1) the minutes of any meetings in which the Trustees considered the Proposal," and "(2) any documents reviewed, considered, or discussed during those meetings ... ." R. 55, June 30, 2017 Order at 9 (emphasis added). Likewise, depositions of the Trustees were *presumptively* disallowed. *Id.* Like discovery management in many cases, the Order explicitly allowed the Plaintiffs to request more discovery if the initial discovery warranted it. *See id.* But they did not ask. Had they done so in a timely and diligent manner, and

had they made a sufficient showing that they needed additional discovery to develop "essential" evidence, as they now argue, that request at least could have been considered during the discovery period and might have been granted. At this late stage, however, the Plaintiffs' Rule 56(d) motion must be denied. *See, e.g., Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 732 (7th Cir. 2004) ("Because the plaintiffs had a fair opportunity to seek discovery … prior to the deadline for filing summary-judgment motions, the district court did not abuse its discretion in refusing to strike [witness's] affidavit or allow additional discovery."); *Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002) ("Where a party's own lack of diligence is to blame for that party's failure to secure discoverable information, it is not an abuse of discretion to deny a Rule 56(f) motion.").

## III. Legal Standards

### A. Summary Judgment

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697,

704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## B. Judicial Review of Trustees' Actions

When, as in this case, the Plaintiffs are challenging the actions of an ERISA plan's trustees, the primary question at the summary judgment stage is whether there is any genuine factual dispute on whether the Trustees abused their discretion or acted arbitrarily and capriciously.[10] But the Plaintiffs argue instead that "[t]he proper standard for review of the trustees' decisions is a de novo review based on ERISA's prudent fiduciary standard." R. 147, Pls.' Opening/Resp. Br. at 9. Given that this Court already decided that the Trustees' decisions are entitled to the deferential

---

[10]The Seventh Circuit has remarked on the "oddity" of applying a standard of judicial review in this context. In *Armstrong v. LaSalle Bank Nat'l Ass'n*, the Seventh Circuit acknowledged that "[s]uch standards are usually meant to guide an appellate tribunal asked to overturn the rulings or findings of a trial-level adjudicator … or (coming closer to home) an ERISA trustee asked to determine a beneficiary's entitlement under a welfare plan." 446 F.3d 728, 732-33 (7th Cir. 2006). But *Armstrong* explained that there can still be "rules as to how much deference a court should give nonadjudicators"—such as the business-judgment rule. *Id.* at 733. Although it declined to adopt a single standard of review for *all* ERISA prudence challenges, the Seventh Circuit held that trustees who are performing a balancing act should not be "seat[ed] … on a razor's edge[,]" and determined that such balancing decisions must be treated deferentially. *Id.*

"arbitrary and capricious" standard, the Plaintiffs are essentially asking the Court to reconsider its previous order. *See* June 30, 2017 Order at 4 ("[A]bsent special circumstances such as fraud or bad faith, the Court cannot second-guess the Trustees' decisions unless those decisions were 'arbitrary and capricious' and constituted abuse of discretion." (cleaned up)).

Reconsideration is not warranted. The Plaintiffs have failed to identify any factual or legal errors, or present any newly discovered evidence, to justify a departure from the prior decision. "A court has the power to revisit prior decisions … in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (cleaned up). *See also Tice v. American Airlines, Inc.*, 373 F.3d 851, 853 (7th Cir. 2004) (explaining that under the law-of-the-case doctrine, "a ruling made in an earlier phase of a litigation controls the later phases unless a good reason is shown to depart from it."); *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) ("Motions for reconsideration serve a limited function; to correct manifest errors of law or fact or to present newly discovered evidence." (cleaned up)). The Plaintiffs insist that the arbitrary and capricious standard—which the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) applied to individual benefits claims—is not appropriate where a party is challenging major plan-administration decisions. R. 147, Pls.' Opening/Resp. Br. at 10. The Plaintiffs are wrong. *Cf.* June 30, 2017 Order at 4 n.3.

For one, the Plaintiffs' reliance on *Allen v. GreatBanc Trust Co.*, 835 F.3d 670 (7th Cir. 2016), is misplaced. The Plaintiffs argue that because *Allen* applied the prudent-fiduciary standard in a valuation dispute, this Court should do the same, R. 147, Pls.' Opening/Resp. Br. at 10. But *Allen* was decided at the motion-to-dismiss stage and was primarily concerned with whether the facts in the complaint told "a plausible story." *Allen*, 835 F.3d at 678. So when the Seventh Circuit remarked that the plaintiffs would be free, at summary judgment, "to compare whatever steps GreatBanc actually took with the procedures that a prudent fiduciary would use[,]" *id.* at 679, there was no discussion of how a *court* would review the fiduciary's actions. In other words, whereas the prudent-fiduciary standard directly applies to ERISA trustees, the abuse-of-discretion standard controls how *courts* should evaluate the trustees' decisions. From the Court's vantage point, the abuse-of-discretion standard does not replace the prudent-fiduciary standard; it just adds another layer of analysis.

This is supported by *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728 (7th Cir. 2006)—which the Seventh Circuit later cited in *Allen*—and by *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011). In *Armstrong*, the Seventh Circuit reversed the district court's grant of summary judgment to LaSalle Bank, finding that there were disputed facts on whether LaSalle—the trustee—abused its discretion by ignoring an increased risk of loss to the trust's beneficiaries. 446 F.3d at 733-34. *Armstrong* first acknowledged that it had previously conducted a plenary, or *de novo*, review of the ERISA trustee's decisions in *Eyler v. Comm'er of Internal Revenue*, 88

F.3d 445, 454-56 (7th Cir. 1996). *Armstrong*, 446 F.3d at 732. Nevertheless, the Seventh Circuit concluded that "a decision that involves a balancing of competing interests under conditions of uncertainty requires an exercise of discretion, and the standard of judicial review of discretionary judgments is abuse of discretion." *Id.* at 733. On that basis, summary judgment was not warranted when there was still a factual question on whether LaSalle acted imprudently by failing to exercise its discretion as a trustee. *Id.* at 734. The Seventh Circuit went on to explain that if LaSalle *did* exercise its discretion (by considering the effect of the increased risk on trust beneficiaries), the trial court would still have to determine whether it abused that discretion. *Id.*

A few years after *Armstrong*, the Seventh Circuit had another opportunity to address the standard of review in ERISA breach-of-fiduciary duty cases. In *George v. Kraft Foods Global*, the Seventh Circuit explained—albeit in *dicta*—that if the trustees can establish that prudence did not require them to make *any* decision in the specific circumstances at issue, then the plaintiffs' claim for breach of fiduciary duty would fail. 641 F.3d at 797. On the flip side, "[i]f plaintiffs establish that defendants *should* have made a decision, but defendants are able to show (1) that they made one and (2) that the decision involved balancing competing interests under conditions of uncertainty, then the question will be whether the fiduciaries *abused their discretion*." *Id.* (emphases added) (cleaned up). So contrary to the Plaintiffs' assertion here, the application of the abuse-of-discretion standard is not necessarily limited to ERISA claims for denial of benefits. *Cf. Varity Corp. v. Howe*, 516 U.S. 489, 514-15

(1996) ("[C]haracterizing a denial of benefits as a breach of fiduciary duty does not necessarily change the standard a court would apply when reviewing the administrator's decision to deny benefits. After all, *Firestone* … based its decision upon the same common-law trust doctrines that govern standards of fiduciary conduct.").

In this case then, "[b]ecause the Trustees have discretionary authority over the management of the Plan and its assets, the Court must accord deference to the Trustees' exercise of that authority." June 30, 2017 Order at 4 (cleaned up). *See also, e.g.*, R. 97-2, Am. Suppl. Compl., Exh. 1 (Trust Agreement) at 14, 16, 18, 20-22. And the Plaintiffs do not appear to contest—nor could they—that the Proposals required the Defendants to balance "competing interests under conditions of uncertainty." *See, e.g.*, R. 169, Pls.' Summ. J. Reply Br. at 3 (arguing that the Defendants are not due any deference because they "fail[ed] to engage in a weighing of the competing interests of different classes of beneficiaries[.]"). In other words, there is no dispute that the prudent-fiduciary standard in this case required some sort of decision or exercise of discretion. So under *Armstrong* and *George*, the question then becomes whether there are enough facts to support a reasonable inference that (1) the Defendants exercised their discretion; and (2) if they did, whether they also abused that discretion.

## C. Abuse-of-Discretion Standard

Here, having been granted wide discretion to manage the Fund and its assets, the Trustees' discretionary decisions in attempting to fulfill their fiduciary duties will

not be deemed arbitrary and capricious "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for [the] particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (cleaned up). It is true, however, that "even review under this most deferential standard does not amount to a rubber stamp." *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 828 (7th Cir. 2004). More specifically, the Trustees' decisions will be found arbitrary and capricious if they "relie[d] upon 'factors which Congress has not intended [them] to consider, entirely failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before [them] or is so implausible that it could not be ascribed to a difference in view or the product of [their] expertise." *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 936 (7th Cir. 1989) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)), *superseded by statute on other grounds*, Pub. L. No. 109–280, § 906(a)(2)(A), 120 Stat. 780, 1051 (2006).

## IV. Analysis

Turning to the merits, ERISA instructs that trustees must act with "care, skill, prudence, and diligence under the circumstances," 29 U.S.C. § 1104(a)(1)(B), in carrying out their fiduciary duty. "To state a claim for a violation of fiduciary duty, the plaintiff must establish: (1) that the defendants are plan fiduciaries; (2) that the

defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff." *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006) (cleaned up). Here, the Plaintiffs claim they are entitled to judgment as a matter of law "under any standard of review" because the record demonstrates that "Defendants breached their fiduciary duties of loyalty and prudence and their fiduciary duty to monitor[.]" R. 169, Pls.' Summ. J. Reply Br. at 4. Naturally, the Fund argues that the Trustees did not abuse their discretion in rejecting Kroger's proposals because the Trustees had to balance the interests of both Kroger *and* non-Kroger participants, and because in doing so, they considered the advice of their financial consultants, lawyers, and staff. R. 160, Defs.' Reply/Resp. Br. at 1-2. As discussed below, the Fund is right: the Trustees did not abuse their discretion in weighing the sometimes-competing interests of the Plan's myriad participants and in making tough choices rife with predictions about the future.

## A. 2014 Proposal

For clarity's sake, it is worth addressing each version of the Proposal separately. First, the Plaintiffs complain that the Trustees violated their fiduciary duty of prudence by engaging in a deficient process to review Kroger's June 2014 Proposal. R. 147, Pls.' Opening/Resp. Br. at 12. As a matter of fact, they claim that the Trustees "took *no* substantive action" on the Proposal. R. 148 (Sealed), Pls.' Opening/Resp. Br. at 3-4 (emphasis added). But a historical timeline of events created for a September 2016 board meeting reveals that the Trustees actually voted to reject the Proposal at a meeting in mid-July 2014. *See* R. 137-7 (Sealed), Defs.' Exh. 14 at

3. Although the Plaintiffs counter that this "post-complaint process cannot backfill violations of the duty of prudence," R. 147, Pls.' Opening/Resp. Br. at 12, they fail to rebut the evidence of the Trustees' vote.[11] Plus, even viewing the evidence in the Plaintiffs' favor, it is not uncommon or unreasonable—especially as a tactical negotiation strategy—for one side of a negotiation to reject an initial offer.

In any event, the Trustees did much more than just reject out-of-hand Kroger's initial Proposal. The record shows that the Plan's Fund Office asked Segal Consulting to prepare an actuarial analysis of the Proposal, which the Trustees discussed at their July 15, 2014 meeting. *See* R. 136-1, DSOF ¶ 8; R. 137-2, Defs.' Exh. 1 at 3; R. 137-3, Defs.' Exh. 2 at 6-7 (meeting minutes stating that "the Agenda Item and attachments … were distributed and discussed[,]" with one of the attachments being Tab B, the Segal Report). The Trustees also considered input from Trustee Charles Whobrey and from Fund Staff, including Thomas Nyhan. *See* R. 137-3, Defs.' Exh. 2 at 6-7. On this point, the Plaintiffs argue that the Defendants violated their duty of prudence because they "failed to consider the Plan's actuaries' advice that the Proposal, if expanded to additional employers, could have forestalled insolvency by twenty

---

[11]The Plaintiffs cite to *Cryer v. Franklin Res., Inc.,* 2018 WL 6267856, at *9 (N.D. Cal. Nov. 16, 2018), in support of their general argument that the Trustees' process for considering the Proposal was deficient, and that post-lawsuit evidence of that process (like the September 2016 chronology) should not be considered. Aside from being a non-controlling decision from another Circuit, *Cryer* is easily distinguishable from the facts here. In *Cryer*, the district court denied a motion for summary judgment where the trustee discussed an investment proposal at *one* meeting before the plaintiffs filed their complaint. *Id.* at *9. Here—in addition to the information contained in the September 2016 chronology that the Plaintiffs object to—there is independent and undisputed evidence that the Trustees discussed the various proposals at least *four times* before the Plaintiffs filed their lawsuit. *See supra* Section I. The other cases the Plaintiffs cite are also unpersuasive.

months." R. 148 (Sealed), Pls.' Opening/Resp. Br. at 12. But this argument is not persuasive. In reality, the evidence shows that the Trustees fully discussed the Segal Report, R. 137-3 (Sealed), Defs.' Exh. 2 at 6-7, which concluded that the Proposal would cause the Plan to "lose employment base, thus become more leveraged and adding risk." R. 137-2 (Sealed), Defs.' Exh. 1 at 5. This could then "be exacerbated by other food industry employers … as well as non-food industry employers ceasing participation in the Plan[,]" *Id.* In addition to discussing the Segal Report, the Trustees also received input from Nyhan, who pointed out that although Kroger's Proposal might postpone the Fund's insolvency by one month (if other food-industry employers remained in the Fund), it could also prompt "many strong, viable employers" to exit, demand no-cash payment deals, and deprive the Fund of "significant revenue" from withdrawal-liability payments, which would likely "have a highly negative impact[.]" R. 137-3 (Sealed), Defs.' Exh. 2 at 8.

The Plaintiffs counter that these risks are "directly contradicted by the numerical data in the report"—referring to Segal Consulting's conclusion that the exit of other food-industry employers would actually delay insolvency by 20 additional months and increase the present value of net cash flows by nearly $1.5 billion. *See* R. 148 (Sealed), Pls.' Opening/Resp. Br. at 3. According to the Plaintiffs, this means that the Defendants abused their discretion and violated their fiduciary duties by engaging in an inadequate process and ignoring relevant information. *Id.* at 11-13. *See also* R. 170 (Sealed), Pls.' Summ. J. Reply Br. at 7-9. But the Plaintiffs neglect to mention that this hypothetical, 20-month figure applied *only* in the case of liability-

transfer withdrawals by all *food*-industry employers; it did not reflect the leverage or risk of such a withdrawal, nor the impact of additional withdrawals by *non*-food industry employers. *See* R. 163 (Sealed), Defs.' Resp. PSOF ¶ 18; R. 137-2 (Sealed), Defs.' Exh. 1 at 4-5. In fact, had the Trustees accepted the 2014 Proposal and ignored the risks outlined by Segal, then the Trustees just as likely would have faced a similar lawsuit from the *non*-Kroger beneficiaries. Ultimately, the Segal Report laid out the impact of various scenarios on the Plan, and the record shows that it was presented to and discussed by the Trustees. Unlike in *Armstrong*, given that the Segal Report here did the work of balancing the competing interests affected by the Proposal— including those of the Kroger Participants—the record shows that the Trustees *did* "consider[] how best to balance the interests of the various participants … [,]" *Armstrong*, 446 F.3d at 734. Even when the evidence is viewed in the light most favorable to the Plaintiffs, it does not raise a reasonable inference that the Trustees abused their discretion by "entirely fail[ing] to consider an important aspect of the problem," *Smart*, 868 F.2d at 936.

Although there is no Seventh Circuit precedent that is directly on point, the reasoning in *Ganton Techs., Inc. v. Nat'l Indus. Grp. Pension Plan*, 76 F.3d 462 (2d Cir. 1996), relied on by the Defendants, makes a lot of sense and supports the Fund's argument here. Just like in *Ganton*, the Trustees had two choices: "They could grant the … transfer … giving an advantage to the departing employees but injuring the Plan and its remaining participants, or refuse the transfer request[,]" making matters more difficult for the Kroger Participants. *See Ganton*, 76 F.3d at 467. So the Trustees

could not have "acted arbitrarily in choosing the option that preserved the Plan's assets and did not significantly harm [the departing] employees." *See id.* (cleaned up).

To be sure, there was no risk that the departing employees in *Ganton* would lose their pension benefits completely, as is the case here. *See Ganton*, 76 F.3d at 467. But given the Plan's impending insolvency and the fact that *all* beneficiaries would lose benefits, the Trustees in this case were essentially tasked with considering which option would cause the least harm. Although the Plaintiffs insist that Kroger's Proposal would not have harmed the Plan, *see, e.g.*, Pls.' Opening/Resp. Br. at 7, the Trustees believed that it would, relying on the Segal report and their own non-arbitrary predictions in the face of uncertainty. So whether Kroger's Proposal would *actually* have injured the Plan is not the question, because there is no genuine dispute that the Trustees considered several sources of input, weighed the risks, and made a choice intended to protect the Plan as a whole. Put differently, even if the Plaintiffs are correct that the "Defendants did not make the decision that provided the greatest value to the Plan and all of the participants," R. 148 (Sealed), Pls.' Opening/Resp. Br. at 15, this *still* does not mean that the Defendants abused their discretion. The arbitrary-and-capricious standard does not require that ERISA trustees make the *right* decisions, just that they make rational ones. *See, e.g.*, *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000) (explaining that when plan documents "confer[] upon the administrator a power of discretionary judgment," the court can set aside the administrator's determination "only if it was 'arbitrary and capricious,' that is, unreasonable, and not merely incorrect … ."); *Gallo v. Amoco Corp.*, 102 F.3d

918, 921 (7th Cir. 1996) ("The plan confers upon the administrator … discretion to interpret it. Therefore the issue for the district court was not whether [the] interpretation was correct but whether Amoco had abused its discretion … ."). Ultimately, on this record, a reasonable factfinder can only find that the Defendants did not abuse their discretion in rejecting a proposal they rationally believed would harm most beneficiaries.

## B. 2015 Proposal

Indeed, the fact that Kroger came back with another proposal in April 2015—one that arguably offered better terms—supports the conclusion that the Trustees did not abuse their discretion in rejecting the initial offer. *See* R. 162, Defs.' Resp. PSOF ¶ 21. Turning to this 2015 Proposal, the Trustees rejected it around four days after it was presented. R. 150 (Sealed), PSOF ¶ 22. The Plaintiffs essentially argue that the Trustees breached their fiduciary duties because "a subcommittee that did not have delegated authority from the trustees took the only vote to reject the Proposal." R. 148 (Sealed), Pls.' Opening/Resp. Br. at 16. Specifically, the Plaintiffs complain that there "is no record of the subcommittee's process or reasoning," no explanation "of who the members of the subcommittee were, or what authority they were vested with," and no actuarial analysis of the 2015 Proposal "in the four days between its receipt and its rejection." *Id.* at 4. But the record does not support the Plaintiffs' position.

For one, the evidence shows that the Trustee Subcommittee that rejected the 2015 Proposal included four employee-trustees and four employer-trustees. *See* R.

137-4 (Sealed), Defs.' Exh. 7 at 2 (listing the individuals in attendance at the April 14, 2015 meeting). Under the Trust Agreement, this was more than enough to constitute a quorum of trustees, which is required for any "business action." *See* Am. Suppl. Compl., Exh. 1 at 16, 22; R. 152 at 38. On top of that, attendees also included six staff members, two representatives from Segal, an independent special counsel, two retiree representatives and counsel, and two other representatives from a law firm. R. 137-4 (Sealed), Defs.' Exh. 7 at 2; *see also* R. 137-7 (Sealed), Defs.' Exh. 14 at 3 (timeline of events stating that the 2015 Proposal was rejected on April 14, 2015). The Subcommittee engaged in a "full discussion" of Nyhan's draft letter rejecting the proposal, and then unanimously approved it. R. 136-1, DSOF ¶ 15; R. 137-4 (Sealed), Defs.' Exh. 7 at 2, 12.

The Plaintiffs imply that the Trustees should have conducted another actuarial analysis before voting to reject the 2015 Proposal. *See* R. 148 (Sealed), Pls.' Opening/Resp. Br. at 4. But they cite no authority for the proposition that fiduciaries are obligated to expend additional resources on issues they can reasonably figure out in consultation with various advisors and based on their own expertise and common sense. *See id.*; *see also Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 861-62 (N.D. Ill. 2009) (despite lack of formal discussions and independent analysis, the defendants— who were high-ranking executives—did not fail to exercise their discretion and were not procedurally imprudent because they frequently discussed the investment amongst themselves). In fact, the Trustees laid out their reasons for rejecting the Proposal in exhaustive detail in the approved rejection letter, including, for example,

that the 2015 Proposal would reduce the Fund's revenues, exacerbate the decline of active participants in comparison to retirees, and cause more significant benefit suspensions. R. 136-7, Defs.' Exh. 5 at 2-4. So contrary to the Plaintiffs' assertions, the record establishes that the Trustees fully considered the 2015 Proposal—including by consulting outside counsel and experts from Segal—and articulated "a rational connection between the facts found, the issue to be decided, and the choice" to reject it. *See Dabertin*, 373 F.3d at 828.

The Plaintiffs next protest that the Trustees "took no action on the Proposal" at the next meeting of the Subcommittee in May 2015, R. 148 (Sealed), Pls.' Opening/Resp. Br. at 4-5, arguing that the Trustees breached their fiduciary duties because they "never questioned, asked for more explanation, or disagreed with any analysis of the Proposal by Defendant Nyhan and the Plan's Staff[,]" R. 147, Pls.' Opening/Resp. Br. at 16. For one, the Trustees had already voted—and not unreasonably—to reject the 2015 Proposal, so there was no need to take further action. *See* R. 162, Defs.' Resp. PSOF ¶ 24. But in any event, the Subcommittee appears to have discussed the 2015 Proposal at length at the May 2015 meeting. *See* R. 149, PSOF ¶ 26; R. 163 (Sealed), Defs.' Resp. PSOF ¶ 27; R. 152 at 38-39, 60-63. What's more, the evidence also shows that (1) the Trustees discussed the 2015 Proposal at a July 2015 meeting of the full Pension Board; (2) Nyhan requested additional information from Kroger throughout 2015 regarding its withdrawal from the Fund; and (3) representatives of the Fund met with representatives of Kroger and IBT in October 2015 "to further discuss Kroger's withdrawal proposal." *See, e.g.*, R.

97-19, Am. Suppl. Compl., Exh. 18 at 5-6 ("Staff intends to gather more information from Kroger … [and] hopes to meet with Kroger representatives to discuss these issues and attempt a resolution … Staff will report to the Trustees concerning the status of these discussions with Kroger."); R. 137-7 (Sealed), Defs.' Exh. 14 at 4 ("At the October 23, 2015 meeting Thomas Nyhan also requested any undisclosed Kroger-IBT side-agreements concerning withdrawal."). The Plaintiffs fail to address the evidence of these ongoing talks, except to point out that "the Fund is not a person and does not attend meetings."[12] *See* R. 153, Pls.' Resp. DSOF ¶ 17. But even if it is true that Nyhan—and not any Trustee—attended the October 2015 meeting, the Plaintiffs fail to explain why it would be inappropriate for the Executive Director to speak with Kroger/IBT on behalf of Fund, especially given the evidence that the Trustees were consistently discussing the Proposal during meetings and staying informed of any changes.

Plus, aside from asking Kroger for additional information, the Trustees also received "more explanation" from Segal Consulting, which prepared yet another actuarial analysis and sent one of their representatives to discuss it with the Subcommittee at the May 2015 meeting. *See* R. 152 (Sealed), Pls.' Exh. 1 at 63, 84-91. The Plaintiffs—presumably referring to this new actuarial report—argue that the

---

[12]The Plaintiffs suggest that the Court should disregard information in the Defendants' September 13, 2016 timeline of events (at R. 137-7) to the extent it is not corroborated by other pre-litigation evidence, because the timeline was created after this litigation had already begun. *See* R. 147, Pls.' Opening/Resp. Br. at 12-13. But at this stage, and as explained above, *supra* note 8, given the Plaintiffs' failure to rebut the factual content of the timeline or the inference that the Defendants properly carried out their fiduciary duties, the timeline serves as relevant evidence of the Defendants' actions.

Defendants breached their fiduciary duties because they "had information indicating the Proposal could have been better for the Plan … but never looked into that possibility." R. 170 (Sealed), Pls.' Summ. J. Reply Br. at 5. Indeed, the Plaintiffs' briefs are replete with these arguments. *See, e.g.*, *id.* at 7 ("Defendants ignored key factors, including actuarial analysis showing that the Proposal would benefit the Plan and was better than a cash withdrawal … ."). But the evidence falls short of raising such an inference. For instance, the Plaintiffs inexplicably emphasize that the 2015 Segal Report predicted a favorable $28-33 million decrease in net cash outflow "if Kroger withdrew as proposed and *also assumed pension obligations for outsourced employees*," R. 148 (Sealed), Pls.' Opening/Resp. Br. at 4-5 (emphasis added). But the Plaintiffs overlook the fact that the 2015 Proposal never covered outsourced employees. *See* R. 136-1, DSOF ¶ 12; R. 153, Pls.' Resp. DSOF ¶ 12 (noting that Kroger expressed "it would be willing to discuss including in its Proposal the benefit liabilities associated with terminated-vested employees[,]" but saying nothing about outsourced employees); R. 152 (Sealed), Pls.' Exh. 1 at 55-56 (May 2015 Kroger letter criticizing the "unfounded assertion" that Kroger is responsible for the pension benefits of outsourced employees).

In reality, the new Segal Report revealed that the 2015 Proposal presented only a $10 million benefit to the Fund compared to withdrawal-liability payments. *See* R. 137-5 (Sealed), Defs.' Exh. 8 at 5 (showing that scenario 2a of the 2015 Proposal would cause a $209 million increase in net cash outflow, compared to $219 million if Kroger made withdrawal liability payments under scenario 3a). According to the

Plaintiffs, this must mean that the Defendants breached their fiduciary duties by "selecting an inferior option when better options are readily available demonstrates a deficient process." R. 147, Pls.' Opening/Resp. Br. at 12 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)). But weighing against this relatively small benefit was Segal's ultimate conclusion that the 2015 Proposal would have an adverse impact on the Fund, and could lead to "accelerated attrition among other … employers" which would have a detrimental effect on net cash flow. R. 137-5 (Sealed), Defs.' Exh. 8 at 7. The Defendants were entitled to rely on Segal's expertise, and the Plaintiffs have not offered any evidence or authority to suggest that this reliance was not justifiable. *See Smith v. Office of Civilian Health and Med. Program of Uniformed Srvs.*, 97 F.3d 950, 959 (7th Cir. 1996) (when reviewing agency decisions for abuse of discretion, the agency "must be given the discretion to rely on the reasonable opinions of its own experts, even if a court finds other views more persuasive[.]" (cleaned up)).

Meanwhile, any other "better option" involved Kroger assuming responsibility for the outsourced employees—whether through a transfer of liabilities or through withdrawal-liability payments—which was obviously not on the table at the time. *See* R. 137-5 (Sealed), Defs.' Exh. 8 at 4-7. But even if the 2015 Proposal *was* the better option, this would not constitute proof of imprudence. "The fiduciary duty of care … requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990). All in all, the evidence does not permit the inference that the Trustees acted imprudently, failed to properly consider the 2015

Proposal, or breached their fiduciary duties. Under these circumstances, a jury could only find that the Trustees weighed the competing interests and reasonably concluded that the risks of the 2015 Proposal outweighed the small potential benefit to the Fund. *See Armstrong*, 445 F.3d at 734 (explaining that one way to determine whether fiduciaries abused their discretion is to ask whether they acted unreasonably under the circumstances); *Trombetta v. Cragin Fed. Bank for Sav. Emp. Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996) ("Absent special circumstances such as fraud or bad faith, the [fiduciary's] decision may not be deemed arbitrary and capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for that decision.").

## C. 2016 Proposal

In January 2016, at another meeting of the Pension Board, the Trustees received updates on the status of Kroger's withdrawal plans. R. 162, Defs.' Resp. PSOF ¶ 31. The Plaintiffs point to this meeting as an example of the Trustees' breach of their fiduciary duties, because the meeting minutes characterize the update as "informational" with "[n]o trustee action required." R. 147, Pls.' Opening/Resp. Br. at 16. According to the Plaintiffs, instead of fulfilling their responsibility to make fiduciary decisions, the Trustees improperly "allowed Defendant Nyhan to act without oversight." *Id.* at 11. *See also id.* at 16 (arguing that the Defendants breached their duty to monitor because they "allowed staff to make crucial fiduciary decisions without meaningful oversight."). But contrary to the Plaintiffs' arguments, the record does not suggest that Nyhan's actions were unilateral.

It is true that Nyhan told the Trustees in January 2016 that "the Fund has communicated [to Kroger and IBT] that it will not facilitate withdrawals … Therefore, the Fund would likely oppose termination of an employer's participation … under conditions inconsistent with the Fund's Trust Agreement []such as a termination of the obligation to contribute before an employer's labor agreement has run its entire term … ." R. 152 (Sealed), Pls.' Exh. 1 at 95 (cleaned up); R. 149, PSOF ¶ 31. But this shows nothing more than that Nyhan was acting pursuant to the Trustees' direction. As discussed above, *supra* Section I(B) in April 2015—and after substantial consideration—a quorum of Trustees had voted unanimously (and reasonably) to reject the 2015 Proposal, specifically stating "the Fund has a firm policy against *facilitating* employer withdrawals in any way, and the Fund has rules in its Trust Agreement and Plan Document prohibiting mid-contract terminations of the obligation to contribute … ." R. 136-7, Defs.' Exh. 5 at 3 (emphasis in original). *See also* R. 150 (Sealed), PSOF ¶ 22; R. 152 (Sealed), Pls.' Exh. 1 at 38. Had Nyhan informed the Trustees that, for example, he had accepted Kroger's latest Proposal on behalf of the Fund—in contravention of the Trustees' April 2015 vote—and had the Trustees taken no action in response, this might then constitute a breach of their fiduciary duty to monitor. But that is not what happened.

And notably, the Trust Agreement *does* state that "[a]n Employer is obliged to contribute to the Fund for the entire term of any collective bargaining agreement or participation agreement … [,]" except in the event that a union loses its status as a bargaining representative or the Trustees determine that an employer's participation

is unlawful or inconsistent with some rule or requirement. R. 97-2, Am. Suppl. Compl., Exh. 1 (Trust Agreement) at 14, 22-23. Apart from that, the Trustees only have the discretionary authority to "waive enforcement/compliance of any right conferred for the benefit of the Fund by any agreement … *when they determine that the waiver is in the best interests of the Fund." Id.* at 23 (emphasis added). So given that the Trustees had already reasonably determined that waiving Kroger's contribution obligations in favor of the Proposal was *not* in the best overall interests of the Fund, Nyhan's statement that the Fund would "likely oppose termination of an employer's participation … under conditions inconsistent with the Fund's Trust Agreement" was in no way unwarranted. Put another way, no reasonable trier of fact could find that the Trustees abused their discretion in fulfilling their duty to monitor Nyhan's activities. To the contrary, the evidence shows that there was no breach: based on the January 2016 meeting, the Trustees fulfilled their fiduciary duties by remaining informed of any changes to Kroger's withdrawal plans and fully engaging in the Fund's response to these plans.

### D. 2016-2017 Negotiations

The Plaintiffs also argue they are entitled to summary judgment because the Defendants "engaged in sham consideration and negotiation" that ultimately harmed the Fund and its beneficiaries. R. 148 (Sealed), Pls.' Opening/Resp. Br. at 17-20. In response, the Defendants assert that the "Plaintiffs cannot show that Defendants' decisions caused any loss or injury to the Fund, as they must to prevail on their claims. It is undisputed that Defendants' decisions culminated in nearly half a billion-

dollar cash settlement with Kroger, which was expected to forestall the Fund's insolvency by several months." R. 137 (Sealed), Defs.' Opening Br. at 2 (cleaned up). *See also* R. 160, Defs.' Reply/Resp. at 15 ("Plaintiffs overlook ample record evidence confirming that the Fund's settlement with Kroger in fact created value for the Fund—not a loss."). Although the evidence suggests that the Defendants appropriately exercised their discretion and did not breach their fiduciary duties— and so it is not actually necessary to address the question of harm—the Court will do so anyway for the sake of completeness. *Cf. Jenkins*, 444 F.3d at 924 (explaining that harm is the third element of a breach of fiduciary duty claim); *Mugnai v. Kirk Corp.*, 843 F. Supp. 2d 858, 872 (N.D. Ill. 2012) ("[A] loss to the plan is a necessary element of any breach of fiduciary duty claim.").

As a preliminary matter, the Plaintiffs' arguments on this point confuse the issues. The Plaintiffs contend that "fiduciaries whose breach renders a plan insolvent" should not be immunized from ERISA liability. R. 147, Pls.' Opening/Resp. Br. at 18 (cleaned up). They also cite caselaw supporting their argument that the loss of pension benefits is an injury under ERISA. *Id.* But the question here is *not* whether the Trustees breached their fiduciary duties by allowing the Fund to become insolvent; rather, the question is whether the Trustees abused their discretion as fiduciaries when they weighed the options before them and ultimately rejected Kroger's various Proposals. In fact, the Plaintiffs implicitly concede this when they go on to claim that "Kroger's straight withdrawal from the Plan" was worth far less than "the Proposal, if expanded to additional employers[.]" R. 148 (Sealed), Pls.'

Opening/Resp. Br. at 19. Essentially, the Plaintiffs' argument boils down to the Trustees breaching their fiduciary duties by making the wrong choice—so the *fact* of the Plan's insolvency is not at issue (and never has been).

Turning to the substantive question of harm, the Plaintiffs claim that the Defendants "chose[] to destroy thousands of retirees' earned post-retirement income streams." R. 147, Pls.' Opening/Resp. Br. at 17. But the fact that Plaintiffs missed out on a financial opportunity they were never entitled to in the first place does not mean they suffered a "loss" in the legal sense. That is, contrary to Plaintiffs' argument that the Trustees violated the duty of loyalty when they decided to "disadvantage one group within [the] plan," *id.* at 15, that duty did *not* require the Trustees to accept any of Kroger's proposals. As a general matter, the duty of loyalty requires a fiduciary to "act as though [he] were a reasonably prudent business person with the interests of *all* the beneficiaries at heart."[13] *Ameritech Benefit Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814, 825 (7th Cir. 2000) (cleaned up). But as the Defendants correctly point out, "a fiduciary's duty of loyalty 'cannot mean that it must cater to the optimal needs of each individual beneficiary' since '[a]ll of the beneficiaries' interests will not always be aligned.'" R. 160, Defs.' Reply/Resp. Br. at 12 (quoting *Ameritech*, 220 F.3d at 825). So while the prospect of losing hard-earned pension benefits is undoubtedly awful, the reality is that the Plaintiffs are in the same position as every other beneficiary of the Fund. And as previously discussed, *supra* Section IV(A)-(D), a jury

---

[13]So in addition to imposing a duty of loyalty on fiduciaries, ERISA also creates a duty of care in executing the duty of loyalty. *Mondry v. American Family Mut. Ins. Co.*, 557 F.3d 781, 807 (7th Cir. 2009). *See also* 29 U.S.C. § 1104(a)(1).

can reasonably conclude that the Trustees' discretionary rejection of Kroger's various proposals was prudently and reasonably intended to protect all Plan beneficiaries, so the Trustees could not have breached their duty of loyalty to the Plaintiffs. From this, it follows that the Plaintiffs were never entitled to the benefits of Kroger's proposals— they were only ever entitled to the Trustees' prudent consideration of them, and this the Plaintiffs did receive. The Plaintiffs cannot, and did not, lose what they never had. *Cf. Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir. 1997) ("[E]ven if the defendants did breach the fiduciary duties they owed to the plaintiffs, in violation of ERISA, the [plaintiffs] are not entitled to recovery of damages … absent proof of an actual economic loss."); *id.* (finding no harm where plaintiffs "got exactly what they were promised under the terms of the employee benefit plan … .").

Meanwhile, for the Plaintiffs' claims under Section 502(a)(2) of ERISA to survive, the evidence must show a loss to the Plan itself. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). Specifically, "losses mean the loss of money or an investment … [L]ost opportunity cost is not loss of money in the context of ERISA." *Int'l Ass'n of Heat and Frost Insulators Local 17 Pension Fund v. American Nat'l Bank and Trust Co. of Chicago*, 13 F. Supp. 2d 753, 755 (N.D. Ill. 1998) (citing *DeBruyne*, 920 F.2d at 465, and *Mira*, 107 F.3d at 472). On this basis, the Plaintiffs' argument that the Trustees' rejection of Kroger's Proposals constituted an injury to the entire Plan is unconvincing. The only evidence of "harm" the Plaintiffs offer is to repeat that "the Proposal, *if expanded to additional employers*, could have increased the present value of net cash flows to the Plan by $1.488 billion through May 2026 …

Kroger's straight withdrawal from the Plan … was worth far less." R. 148 (Sealed), Pls.' Opening/Resp. Br. at 19 (emphasis added). Not only is there zero evidence that these "additional employers" would have wanted to withdraw on the same terms as the 2014 Proposal, but the Plaintiffs are also conflating "benefit" with "harm." Put differently, actuarial evidence that the Plan *might* have benefited under certain circumstances is not the same as evidence that the Plan suffered an economic loss absent that opportunity. As it currently stands, the record only permits an inference that the Plan is in the same financial position it was in before Kroger offered the 2014 Proposal, so the Defendants' alleged breaches could not have caused a "loss" within the meaning of ERISA.

In sum, even viewing the evidence in their favor, the Plaintiffs have failed to meet their burden of showing that the Defendants acted arbitrarily and capriciously. As explained above, this Court cannot evaluate the Defendants' decisions "from the vantage point of hindsight." *DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 720 F. Supp. 1342, 1348 (N.D. Ill. 1989), *aff'd*, 920 F.2d 457 (7th Cir. 1990). "Rather, the [C]ourt must consider the prudence of defendants' conduct at the time" they made their decisions. *Id.* Here, the record, even when viewed in the light most favorable to the Plaintiffs, conclusively shows that the Defendants did not act arbitrarily and capriciously. Instead, they prudently exercised their discretion and prudently carried out their fiduciary duties in considering Kroger's various withdrawal proposals.

## V. Conclusion

For the reasons explained above, the Plaintiffs' motions for summary judgment and for additional discovery are denied, and the Defendants' motion for summary judgment is granted in its entirety. Final judgment will be entered. The status hearing of April 9, 2020 is vacated.

ENTERED:

_s/Edmond E. Chang_
Honorable Edmond E. Chang
United States District Judge

DATE: March 22, 2020